# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | |
|---|---|
| RESTAURANTS UNLIMITED, INC., a foreign ) | |
| corporation doing business in Illinois, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. _____ |
| v. ) | |
| ) | Division No. _____ |
| JACQUELINE N. TAYLOR, AS ) | |
| TRUSTEE OF THE JACQUELINE N. ) | |
| TAYLOR TRUST UNDER AGREEMENT ) | |
| DATED APRIL 17, 1998, ) | |
| ) | |
|     Serve: ) | |
|     Jacqueline N. Taylor at: ) | |
|     2124 County Road 250E ) | |
|     Mahomet, IL 61853 ) | |
| ) | |
| and ) | |
| ) | |
| RUSSELL H. TAYLOR, AS TRUSTEE OF ) | |
| THE ROBERT C. TAYLOR TRUST FUND ) | |
| DATED JUNE 12, 1984 AND AMENDED ) | |
| JUNE 14, 1984, ) | |
| ) | |
|     Serve: ) | |
|     Russell H. Taylor at: ) | |
|     1304 Woodland Court ) | |
|     Mahomet, IL  61853 ) | |
| ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

COMES NOW Plaintiff, Restaurants Unlimited, Inc., and for its Complaint against

Defendants, Jacqueline N. Taylor, as Trustee of the Jacqueline N. Taylor Trust Under Agreement

Date April 17, 1998, and Russell H. Taylor, as Trustee of the Robert C. Taylor Trust Fund Dated

June 12, 1984, states the following:

3408420

**PARTIES, JURISDICTION, AND VENUE**

1.    Restaurants Unlimited, Inc., d/b/a/ Hen House Restaurants ("Plaintiff" or "Hen House"), is a corporation organized and existing in good standing under the laws of Missouri, with its principal place of business in Missouri and authorized to do business in Illinois.

2.    Upon information and belief, Jacqueline N. Taylor is Trustee of the Jacqueline N. Taylor Trust Fund under Agreement Dated April 17, 1998 (as amended, the "Jacqueline Taylor Trust").  Upon information and belief, Jacqueline N. Taylor is an Illinois resident living at 2124 County Road 250E, Mahomet, Illinois 61853.

3.    Upon information and belief, Russell H. Taylor is Trustee of the Robert C. Taylor Trust Fund dated June 12, 1984 and amended June 14, 1984 (as amended, the "Robert Taylor Trust").  Upon information and belief, Russell H. Taylor is an Illinois resident living at 1304 Woodland Court, Mahomet, Illinois 61853.

4.    The Jacqueline Taylor Trust and the Robert Taylor Trust are each shown to be record owner of an undivided one-half (1/2) interest in the Demised Premises (as defined herein), and are collectively referred to as the "Defendants" or the "Taylor Family".

5.    Jurisdiction is proper on diversity grounds because this is a civil action between citizens of different states and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.  *See* 28 U.S.C. §§ 1332(a), 1441(b). Moreover, this action is properly filed in the Urbana Division of the United States District Court for the Central District of Illinois pursuant to Local Rule 40.1 because the dispute arises from real property located in Champaign County, Illinois.

6.    Venue is proper pursuant to 28 U.S.C. §1391.

3408420                                    - 2 -

## **FACTUAL BACKGROUND**

7.    On or about March 18, 1975, Robert C. Taylor and Jacqueline N. Taylor ("Original Landlord") and Hen House Interstate, Inc. ("Original Tenant") entered into that certain Lease, a true and accurate copy of which is attached hereto as **Exhibit A** (the "Lease").

8.    Defendants are the successors-in-interest to Original Landlord, and constitute the current "Lessor," under the Lease.

9.    Plaintiff is the successor-in-interest to Original Tenant, and is the current "Lessee," under the Lease.

10.   Pursuant to the Lease, Defendants leased certain real property and improvements located thereon to Plaintiff, commonly known as the Hen House Restaurant in the Village of Mahomet, Champaign County, Illinois, and generally located at the northeast corner of the intersection of Eastwood Street and Illinois Route 47 (the "Demised Premises").

11.   Upon information and belief, the Illinois Environmental Protection Agency has determined that the Demised Premises are the source of certain environmental contaminants which have effected the quality of the groundwater beneath the Demised Premises and the quality of the groundwater elsewhere in the community.

## **COUNT I – SPECIFIC PERFORMANCE**

12.   Hen House incorporates by reference Paragraphs 1-11 above as though the same were fully set forth herein.

13.   Pursuant to Section 25 of the Lease, Plaintiff is given the right and option to elect to purchase the Demised Premises (the "Purchase Option").  The Purchase Option states:

PURCHASE OPTION – RIGHT OF REFUSAL

Lessee shall have at any time during the original term of this lease, or any extension thereof, the option to purchase the demised premises at fair market value as determined by agreement or appraisal as hereafter provided, but for no less than the sum of One Hundred Sixty Thousand Dollars ($160,000.00). Upon written notice of Lessee to Lessor of its determination to exercise this option, the parties shall seek agreement on the option price. If no such agreement can be reached within thirty (30) days of such notice then Lessor and Lessee shall each appoint within ten (10) days one appraiser from the community wherein the demised premises are located and if said appraisers are unable to agree within thirty (30) days of their appointment upon the fair market value of the premises, then they shall immediately appoint a third appraiser. The decision of any two of such appraisers shall be conclusive as to the fair market value of the demised premises with respect to this paragraph. Lessee's election to exercise the purchase option shall be by written notice to Lessor within forty-five (45) days after the option price has been determined whether by agreement or appraisal.

If, anything to the contrary herein notwithstanding, during the term hereof or any extension, Lessor or Lessor's successor in interest shall receive an acceptable offer for the sale of the demised premises or for a lease to commence upon the expiration or earlier termination of this lease, Lessor prior to acceptance shall give Lessee notice of such offer and Lessee shall have sixty (60) days from receipt of Lessor's notice to elect to purchase or lease the premises, as the case may be, on the terms of said offer. Lessee's failure to exercise this right of first refusal shall not affect this lease or the continuance of Lessee's rights and options herein.

*See* Exhibit A, § 25.

14. In compliance with the notice provisions contained within Section 25 of the Lease, on or about March 17, 2005, Plaintiff notified Defendants of Plaintiff's decision to exercise its right to begin proceedings with respect to the Purchase Option as set forth in the Lease (the "Notice of Exercise"). A copy of Plaintiff's Notice of Exercise is attached hereto as **Exhibit B**.

15. Included along with the Notice of Exercise was a copy of the Survey and an appraisal of the Demised Premises, dated January 10, 2005 ("Plaintiff's Appraisal"), which Plaintiff had caused to be performed on its behalf by James H. Webster, MAI, SRA of James H.

Webster & Associates, Ltd. ("Plaintiff's Appraiser").  A copy of Plaintiff's Appraisal is attached hereto as **Exhibit C**.

16.  Plaintiff's Appraisal establishes the fair market value of the Demised Premises to be Two Hundred Fifty Thousand Dollars ($250,000.00), as of January 10, 2005, in the opinion of Plaintiff's Appraiser.  Such opinion of value assumes the Demised Premises to be free of all environmental contaminants.

17.  Plaintiff's Notice of Exercise advised Defendants that, in the opinion of Hen House, the fair market value of the Demised Premises was $250,000; that Hen House would like to reach an agreement with Defendants as to the fair market value of the Demised Premises; and that Plaintiff's offer assumed it would have no liability for the current environmental condition of the Demised Premises or any remediation or other "clean-up" activities that may be required in connection therewith, but rather that it was free of contaminants and in compliance with all environmental and other applicable laws pertaining thereto.

18.  By e-mail dated March 29, 2005, Jeffery B. Wampler, Esq. ("Wampler") advised that he represented Defendant Jacqueline Taylor with respect to the Demised Premises; acknowledged that the Lease provides for 30 days from the date of Plaintiff's Notice of Exercise (i.e., April 16, 2005 or the "Price Agreement Deadline") for the parties to reach agreement on price; and promised a proposal from Defendants.

19.  By e-mail at 4:14 p.m. on Friday, April 15, 2005, Wampler advised that he had spoken with the Taylor Family about valuation of the Demised Premises, and that "*After careful consideration, The Taylors have determined that their opinion of Fair Market Value is $425,000.00, in "as-is" condition.*"

20.  Counsel for Hen House immediately responded that, given the $175,000 difference in opinion as to the fair market value of the Demised Premises, the appraisal procedures set forth in the Lease would likely need to be adhered to, but Defendants' offer would be relayed to Plaintiff.

21.  By letter and e-mail dated Tuesday, April 19, 2005, counsel for Hen House confirmed unto counsel for Defendants that the gap in the parties' position essentially eliminated any reasonable prospect of their ability to voluntarily reach an agreement as to value and avoid the Lease appraisal process as contained in Section 25 of the Lease.  Such letter ("Tenant's Designation of Appraiser," a copy of which is attached hereto as **Exhibit D**)**,** also formally acknowledged that Hen House selected Plaintiff's Appraiser as its appraiser, as required by Section 25 of the Lease, and further requested that Defendants advise Plaintiff as to the identity and credentials of the appraiser to be selected by Defendants (if any) at their earliest convenience, along with any supporting documentation or analysis upon which Defendants' prior opinion of value was based.

22.  Pursuant to Section 25 of the Lease, if the parties were unable to reach agreement on the price to be paid by Plaintiff for electing to consummate the Purchase Option (i.e., the fair market value of the Demised Premises or "Option Price"), on or before the Price Agreement Deadline (April 16, 2005), then each party was required to appoint, within ten (10) days thereafter (by April 26, 2005) (hereinafter "Appraiser Designation Deadline"), one appraiser from the community wherein the Demised Premises is located.

23.  Defendants failed to properly or timely provide notice of designation of an appraiser as required by Section 25 of the Lease on or before the Appraiser Designation Deadline.

24.    Rather, via a phone call and e-mail from Wampler on May 10, 2005, for the first time, Defendants proposed to identify as their appraiser, Lloyd Brown of 118 S. Race in Urbana, Illinois ("Defendants' Appraiser").

25.    On June 13, 2005, counsel for Plaintiff again wrote to Wampler advising that, contrary to the Lease requirements, Defendants failed to timely or properly appoint Defendants' Appraiser, and furthermore, that still no supporting documentation had been provided to support Defendants' opinion of value.  Plaintiff nevertheless indicated a willingness to try to continue to accommodate "reasonable delays and extensions," but expressed concern that the "appraisal process" called for by the Lease may not be completed on or before the Lease's then pending expiration date (July 31, 2005, or the "Stated Lease Expiration Date") due to Defendants' continuing failure to timely perform as required by the Lease.

26.    In an effort to resolve the breach of the Lease agreement by Defendants due to Defendants' delays and failure to act, and attempt to continue to work with Defendants in good faith in connection with exercising its Purchase Option rights under the Lease, Plaintiff offered to agree to a temporary arrangement with Defendants whereby the parties would "preserve the status quo" with respect to the Lease and the landlord-tenant relationship between them regarding the Demised Premises with the understanding that the Lease would be deemed to remain in effect following the Stated Lease Expiration Date, including Plaintiff's Purchase Option rights thereunder, and that Plaintiff would be allowed to remain in occupancy thereof on a 30-day month-to-month notice basis, without any increase in rent until the purchase option process was completed.

27.   Later that same day, Wampler responded that if the Purchase Option process was not completed by July 31, 2005, Defendants would agree that Plaintiff would become a month-to-month tenant.

28.   On or about June 14, 2005, Defendants' counsel mailed to Plaintiff a copy of an appraisal ("Defendants' Appraisal") dated June 6, 2005, prepared for Russ Taylor by J. Lloyd Brown of Brown & Brown Real Estate Appraisals.  A copy of Defendants' Appraisal is attached hereto as **Exhibit E** .

29.   Defendants' Appraisal asserts that the fair market value of the Demised Premises is Three Hundred Sixty-Five Thousand Dollars ($365,000.00), as of May 27, 2005, in the opinion of Defendants' Appraiser.  Such opinion of value is expressly predicated on, among other things, assumptions that there is no environmental contamination or hazardous substances located on or in the proximity of the Demised Premises that would cause a loss in value, and that it is in full compliance with all applicable federal, state and local environmental laws.

30.   Plaintiff subsequently attempted to engage in further negotiations to voluntarily settle the difference between the parties as to the fair market value of the Demised Premises, but it was clear that the parties would not be able to do so.  The parties acknowledged the likely futility of seeking to cause a licensed appraiser to change its formal opinion as to value, and the wisdom of attempting to establish mutually acceptable and specific "ground rules" on how to proceed forward in determining the Option Price to be paid for the Demised Premises as contemplated and required by the Lease, including but not limited to appointment of a "third appraiser."

31.   Despite Plaintiff's best efforts, Defendants have failed and refused to comply and continue to fail and refuse to comply with the valid, binding and enforceable Lease and Purchase Option by, inter alia:

(a) failing to timely designate their appraiser as required in Section 25 of the Lease agreement;

(b) failing to evaluate in a timely fashion the Demised Premises at fair market value;

(c) failing to agree to the appointment of a third appraiser as required by Section 25 of the Lease agreement;

(d) failing to act in good faith and provide environmental information known to the Defendants which effects the fair market value of the Demised Premises;

(e) inhibiting the ability of a third appraiser's fair market value appraisal by insisting that the appraisal not take into account environmental conditions or situations at the Demised Premises; and

(f) refusing to be bound by the findings of a third appraiser.

32.   Moreover, Hen House has performed or satisfied all of its obligations with respect to the Lease and its Purchase Option rights thereunder and at all times has been ready, willing, and able to completely perform pursuant to the Purchase Option.

33.   As set forth above, Defendants have failed and refused to perform or satisfy all of their obligations under the Lease and Plaintiff's Purchase Option rights thereunder.

34.   Moreover, the Defendants' delay in performing or satisfying all of their obligations under the valid, binding and enforceable Lease and Plaintiff's Purchase Option has caused Plaintiff to suffer direct injury, financial loss, and damage.  Thus, in addition to the equitable relief to which the Plaintiff is entitled, Plaintiff is also entitled to damages resulting from the Defendants' delay in performing under the Lease and Plaintiff's Purchase Option.

WHEREFORE, Hen House prays that this Court enter judgment in its favor and against Defendants as follows:

A.    Declaring that Defendants do not have the right to refuse to agree to sell the Demised Premises;

B.    Declaring that Plaintiff has complied with all of the procedural and notice requirements of the Lease;

C.    Ordering Defendants to proceed with the valuation process, with full consideration of the Demised Premises' environmental condition, required by Section 25 of the Lease to determine the Option Price **as of May 2005**, which is the timeframe that the third appraiser would have been appointed to determine the Option Price pursuant to Section 25 of the Lease but for Defendants breach of the Lease;

D.    Ordering Defendants to reimburse Plaintiff for rental payments made since May 2005 since such payments would not have been made but for Plaintiff's breach of the Lease;

E.    Ordering Defendants to pay damages, plus interest in a fair and reasonable amount, to the Plaintiff for other injuries suffered by the Plaintiff due to the Defendants' delay in performing their obligations under the Lease and Plaintiff's Purchase Option;

F.    Ordering Defendants to pay all attorney's fees and expenses incurred by Plaintiff in pursuing this action;

G.    Awarding Plaintiff its costs of suit; and

H.    Granting such other relief as is appropriate.

## COUNT II – BREACH OF CONTRACT

35. Hen House incorporates by reference Paragraphs 1-34 above as though the same were fully set forth herein.

36. The Lease and Plaintiff's Purchase Option rights thereunder constitute a valid, binding and enforceable contract between Plaintiff and Defendants.

37. Plaintiff has performed or satisfied all of its obligations with respect to the Lease and the Purchase Option by adhering to the provisions set out in Section 25 of the Lease agreement.

38. Defendants' failure and refusal to perform or satisfy all of their obligations under the valid, binding and enforceable Lease and Plaintiff's Purchase Option rights thereunder constitutes a breach of contract.

39. Defendants' breach of the Lease and the Purchase Option has caused direct injury, financial loss, and damage to the Plaintiff.

WHEREFORE, Hen House requests that the Court enter judgment in its favor and against Defendants as follows:

A. Declaring Defendants to be in breach of the Lease as a result of their failure to abide by the terms of the Lease including the Lease terms with respect to Plaintiff's Purchase Option rights thereunder;

B. Awarding damages plus interest in a fair and reasonable amount;

C. Ordering Defendants to pay all attorney's fees and expenses incurred by Plaintiff in pursuing this action;

D. Awarding Plaintiff its costs of suit; and

E. Granting such other relief as is appropriate.

3408420

- 11 -

Respectfully submitted,

**THOMPSON COBURN LLP**

/s/ Joseph M. Kellmeyer
Joseph M. Kellmeyer # 06205864
One US Bank Plaza
St. Louis, MO 63101
314-552-6000
FAX 314-552-7000
jkellmeyer@thompsoncoburn.com

Attorney for Plaintiff, Restaurants
Unlimited, Inc.

**JS 44** (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Restaurants Unlimited, INC.

## DEFENDANTS
Jacqueline N. Taylor; Russell H. Taylor

**(b)** County of Residence of First Listed Plaintiff  St. Louis County, MO
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Champaign County, IL
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Joseph M. Kellmeyer, Thompson Coburn LLP, One US Bank Plaza, St. Louis, MO 63101. Phone: 314-552-6000

Attorneys (If Known)
Jeffery B. Wampler, Erwin, Martinkus & Cole, Ltd., 411 W. University Ave., Champaign, IL 61820. Phone: 217-351-4040

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332(a), 1441(b)
Brief description of cause:
Specific Performance of Contract; Breach of Contract

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ sp. perf. and/or dmgs >$75,000
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE _____
DOCKET NUMBER _____

DATE 8/16/06
SIGNATURE OF ATTORNEY OF RECORD _(signature)_

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

E-FILED
Monday, 21 August, 2006 11:33:37 AM
Clerk, U.S. District Court, ILCD

LEASE

THIS LEASE is made and entered into this ____ day of ____
19__, by and between ·········· Robert C. Taylor and ___, hereinafter referred
to as Lessor, and HEN HOUSE INTERSTATE, INC., hereinafter referred to
as Lessee.                                    Jacqueline N. Taylor

WITNESSETH, Lessor does hereby lease and demise unto Lessee a
portion of the real property (hereinafter called the "demised premises")
described in Exhibit A attached hereto and made a part hereof, situated
in the _____ County of Champaign _____, and containing approximately
__ one acre _____. An inexact copy of a plat showing the demised
premises is attached hereto as Exhibit B. Each party agrees, upon
request of the other to replace said inexact copy of the plat of the
demised premises with an exact copy of the plat of the demised premises
and subscribe its signature thereto prior to commencement of rent.

1. LEASE TERM

To have and to hold the same for and during the term commencing
on the _____, and expiring on the _____,
inclusive, subject, however, to the provisions of Paragraph 1-A hereof.

A. COMMENCEMENT OF RENT AND TERM. Anything in this Lease contained
to the contrary notwithstanding, the term of this lease and the accrual
of rent hereunder shall commence on the date the Lessor has completed
the construction of improvements, including blacktopping, as herein-
after defined. The Lessor shall have completed the construction of
improvements in accordance with this Lease when such completion has
either been accepted by Lessee, or certified by the architect, if any,
employed in connection with said improvements, and so evidenced by the
proper municipal authorities by the granting of a certificate of
occupancy.

The Terms of this Lease shall expire _20_ years after the end of
the calendar month in which business commences. In the event that the
date of commencement of rent hereunder shall occur on a day of the
month other than the date specified in Paragraph 1 of this Lease, the
first rental payment (and the last rental payment), if applicable,
shall be adjusted for the proportionate fraction of the whole month so
that all rental payments other than the first shall be made and become
due and payable on the day of each month specified in Paragraph 3 of

EXHIBIT

A

this Lease.  A supplement to this Lease is hereto attached and made a part hereof containing blanks for the date of commencement and expiration of said term.  Each party hereto agrees, upon request of the other to endorse date of commencement and date of expiration upon said supplement, forming a part of the other party's copy of this Lease, and subscribe his or its signature, the respective date of commencement and expiration of said term to the end that said dates may be made certain as and when they have been finally determined.

B.  Lessee may, by giving notice to Lessor six (6) months or more before the last day of the original term of this lease, extend such term for a period of five (5) years so long as gross receipts of the restaurant and gift shop contemplated herein are equal to or exceed One Hundred Thousand Dollars ($100,000.00) in the calendar year next preceding the last day of the original or extended term.  And thereafter, Lessee may renew this lease in the same manner and under the same conditions for one additional five (5) year renewal period.

2.  IMPROVEMENTS

A.  Lessor shall obtain at its expense all zoning and permits necessary for construction on demised premises as provided for herein.

B.  CONSTRUCTION OF IMPROVEMENTS BY LESSOR.  Lessor agrees to construct, at its expense restaurant/gift shop improvements on the demised premises in accordance with the plans and specifications agreed upon by Lessor and Lessee and initialed by the representatives of the parties.  Lessor shall permit and facilitate inspection of the work by Lessee and its agents and public authorities at all times.  Upon completion of the construction work, Lessor shall remove from the demised premises all rubbish, implements, and surplus materials and leave the demised premises and improvements broom clean.

All licenses and permits which may be required for the purpose of erecting and maintaining said improvements shall be secured from the proper authorities by the Lessor, and Lessor shall, upon the signing hereof, promptly make application for, and diligently proceed with such action as may be required to secure such licenses and permits. Upon securing said licenses and permits, Lessor shall promptly begin the construction of said improvements.

- 2 -

Lessor shall blacktop an area adjacent to the restaurant/ gift shop building to accommodate parking for at least fifty (50) cars.

C.  IMPROVEMENTS BY LESSEE.  Lessee agrees to furnish and install at its expense, all kitchen, restaurant and gift shop furniture, equipment, and fixtures necessary for the efficient operation of the facility.  Lessee further agrees that all interior decorating shall be his responsibility and expense.

D.  TIME FOR COMPLETION OF CONSTRUCTION.  Lessor expressly agrees that he will complete construction within 150 days after permits are obtained and will diligently proceed with the construction of the building and improvements as aforesaid and that the same will be completed without unnecessary delay.

The aforesaid terms shall except strikes, union disputes, acts of God and other delays not caused by Lessor and outside its control.

E.  ADDITIONAL IMPROVEMENTS.  Lessee shall have the right, with written permission of Lessor, at any time and as often and frequently as it wishes during the term of this Lease, to erect and/or install such other or additional improvements on the demised premises as it may deem desirable for conducting Lessee's operation thereon (or for such other business to which Lessor may consent, and such consent shall not be unreasonably withheld); it being understood and agreed that all such other or additional improvements, erected and/or installed upon the demised premises by Lessee shall always remain the property of Lessor.  Lessee shall have no authority to create or place any lien or encumbrance of any kind whatsoever upon, or in any manner to bind the interest of Lessor in, the demised premises, and Lessee covenants and agrees promptly to pay all sums legally due and payable by Lessee on account of any labor performed on the demised premises on which any lien is or can legally be asserted against the demised premises or the improvements thereon.

- 3 -

Lessee will, within thirty (30) days after the expiration of the term of this lease other than by re-entry and repossession of said property by Lessor as herein provided, have the right to remove, all restaurant equipment and, all signs, and Lessee may remove all other items which are distinctive of the Lessee's operation and which may be required to be removed under any franchise agreement, provided that Lessee shall repair any damage to the improvements resulting from such removal, and Lessor covenants not to thereafter use the Hen House name, trade marks or signs distinctive to the Hen House System.

F.  SIGNS

Lessor and Lessee mutually agree to share in the cost and expense whether by purchase or lease of four interstate signs (16' x 60') advertising the business herein contemplated.

G.  OWNERSHIP OF PLANS AND SPECIFICATIONS AND OF OTHER TRADE SECRETS

Lessor acknowledges that the plans and specifications provided by Lessee are the sole property of Lessee, and Lessor agrees that he will not knowingly or willfully, nor will Lessor suffer or permit his contractors and subcontractors or any other person or persons who may have access to said plans and specifications, to use the same in whole or in part for the design or construction of any building or improvements other than those to be constructed by the Lessor upon the demised premises in accordance with the provisions contained in this lease and Lessor further agrees, promptly after the completion of construction hereunder, to return or cause to be re-turned to the Lessee the originals of said plans and specifications and all copies made thereof by the Lessor or his contractors or subcontractors.

3.  RENTAL

Lessee agrees to pay Lessor as rental for the demised premises and all ground improvements installed by Lessor as set forth in Paragraph A, but in no event less than the minimum rent set forth in Paragraph B:

A.  Lessee agrees to pay Lessor as rent a sum equal to 5 percent of gross annual sales volume on all sales within the restaurant/gift shop building in excess of $50,000 per year.  Gross sales do not include any retail sales tax for which Lessee merely acts as collector for governmental authority, nor for the purpose of computing percentage rent, sales from candy, soft drink or cigarette vending machines on the premises.

-4-

B.  For each year during the term of this lease, and all renewals, minimum rent shall be no less than $~~XXXXXXXXX~~ $20,200.00.  *Rct  JnJ  *16 Rs.35  *

C.  Rent shall be payable montly, beginning thirty days after commencement as defined in Paragraph 1.  Should rent paid under Paragraph A not Equal or exceed minimum rent due according to Paragraph B, the balance of annual minimum rent shall be paid within thirty days after the anniversary of said commencement date.

4.  COVENANTS OF LESSOR

(Lessor covenants that it is seized in fee simple of the demised premises and that the same is free of all liens, encumbrances, easements conditions, covenants and restrictions.)

~~·XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
~~XXXXXXXXXXXXXXXX~~ Lessor covenants that it has the full right to make this Lease and that so long as Lessee shall not be in default hereunder, Lessee shall quietly hold, occupy, and enjoy the demised premises during all of the term hereof.  Lessor agrees upon request by Lessee to join with Lessee and to sign promptly and without charge therefore to Lessor any applications for licenses and permits as may be required by Lessee for the conduct and operation on the demised premises of the business herein contemplated.

5.  ASSIGNMENT AND SUBLETTING

Lessee shall have the right to assign this Lease or sublet the demised premises in whole or in part without Lessor's consent but assignment of the Lease or subletting of the premises shall not operate to relieve Lessee of any of its obligations under this Lease. In the event of assignment or subletting, Lessor shall be furnished with an executed copy of the assignment or sublease and the address of the Assignee or Sublessee.  Thereafter Lessor shall give Assignee or Sublessee a duplicate copy of any notice given Lessee pursuant to this Lease and no notice to Lessee shall be effective unless a duplicate copy is given to such Assignee or Sublessee.  The Assignee or Sublessee shall have the same right to cure defaults as are by the

- 5 -

terms of this Lease given Lessee and Lessor will accept performance by the Assignee or the Sublessee of any of the terms conditions and covenants of this Lease with the same force and effect as though performed by Lessee.

6.    TAXES AND ASSESSMENTS

A.    PAYMENT BY LESSOR.   Lessor agrees to pay all real estate taxes and assessments imposed which become due and payable in connection with the demised premises (including all buildings and improvements thereon during the term hereof and Lessee shall reimburse Lessor for all such taxes and assessments assessed against Lessee's improvements paid by Lessor within thirty (30) days of receipt of written notice received by Lessee of such sums paid by Lessor.   All taxes will be prorated to reflect the actual period of occupancy by Lessee.

7.    Lessee agrees that it shall have use of aforesaid premises for purposes of operating a restaurant/gift shop thereon and for no other purposes without the written consent of Lessor.   Lessor agrees that during the term of this lease, and any renewal thereof, not to conduct, or allow to be conducted, any fast food service characteristic of Lessee's operation on any of the property owned or controlled by Lessor within one (1) mile of the demised premises.



-6-

8.  MAINTENANCE AND REPAIRS

Lessor subject to exceptions below will maintain the building, driveways, water pipes, drain and sewers at or appurtenant to the demised premises and all of Lessor's equipment on the demised premises in good and sufficient condition and repair during the whole of the term hereof, and shall make any and all repairs, alterations or improvements thereto which may be required by public authority.  Lessee agrees to make or cause to be made all minor repairs to premises costing less than Fifty Dollars ($50.00) per item, and Lessor agrees to make all repairs costing Fifty One Dollars $51.00) or more per item.  Lessee further agrees at his sole expense to maintain all furniture, fixtures, and equipment furnished and installed by him.

9.  INSURANCE .

Lessor shall not be liable to Lessee or to Lessee's (or any subtenant's) employees, lessees, licenses, or visitors, for any damage to person or property caused by any act, omission, or neglect of Lessee, any other tenant of the demised premises, or any other person. Lessee shall carry at its own cost (or cause to be carried by sublessees or others) comprehensive public liability insurance with limits of not less than $100,000/$500,000 for bodily injury and death and not less than Twenty-Five Thousand & No/100 Dollars $25,000.00) for property damage, indemnifying and holding Lessor and Lessee harmless from and against claims for injuries and death sustained by persons or property while on the demised premises, Lessee shall, at its own cost, adequately insure the demised premises and improvements thereon against loss from fire and other perils included in the so-called extended coverage insurance endorsement and shall carry plate glass insurance for all plate glass in the demised premises naming the Lessee and Lessor as interest may appear, and to furnish to Lessor appropriate evidence that such insurance is in effect.

A.  INDEMNITY RE RIGHT OF INGRESS AND EGRESS

Lessor, its agents and employees, shall not be liable for any loss, damage, injuries or other casualty of whatsover kind

-7-

or by whomsoever caused, to the person or property of anyone (Including Lessee) arising out of or resulting from the right of ingress and egress herein granted to the Lessee; and the Lessee, for himself, his heirs, executors, administrators, successors and assigns, hereby agrees to indemnify and hold Lessor, its agents and employees, harmless from and against all claims for such loss, damage, injury or other casualty.

10.    CONDEMNATION

If the whole of the demised premises shall be taken or condemned by any competent authority for any public use or purpose during the term of this Lease, Lessee reserves unto itself the right to prosecute its claim for an award based upon its leasehold interest for such taking, without impairing any rights of Lessor for the taking of or injury to the reversion.

In the event that a part of the demised premises shall be taken or condemned and that the part so taken includes the building on the demised premises or any part thereof, then and in any such event the Lessee may at any time either prior to or within a period of sixty (60) days after the date when possession of the premises shall be required by the condemning authority, elect to terminate this Lease.  In the event that Lessee shall not exercise any such option to terminate this lease, then and such event the Lessor shall, with reasonable promptness, make necessary repairs to and alterations of the improvements on the demised premises for the purpose of restoring the same to an economic architectural unit, susceptible to the same use as that which was in effect immediately prior to such taking, including sufficient parking area.

11.    DESTRUCTION OF IMPROVEMENTS

In the event that the improvements upon the demised premises shall be damaged or destroyed by fire or other cause, Lessor will, at Lessor's expense promptly repair or restore the improvements so damaged or destroyed to their condition immediately prior to such damage or destruction.  In the event that the

improvements are rendered partially untenantable as a result of such fire or other cause, the rent shall abate in the proportion that the area of the improvements rendered untenantable bears to the total area of the improvements prior to such damage or destruction, and in the event that the damage is so extensive as to render the improvements entirely untenantable, all rent shall cease until Lessor completes such repairs or restoration. If Lessor fails to commence or to complete such repairs or restoration with diligence, Lessor and Lessee agree to terminate this Lease.

12. DEFAULT

Lessor and Lessee agree, that if default shall be made at any time by Lessee in payment of the rental provided herein, or if Lessee shall be in default of, or violate any covenant herein contained, and if such failure, violation, or default shall continue for fifteen (15) days in the case of non-payment of rent, or thirty (30) days for other matters, after notice in writing thereof by Lessor to Lessee, it shall be lawful for Lessor, at its election, after the termination of said fifteen (15) or thirty (30) day period, as the case may be, to declare the term of this Lease ended and this Lease terminated, cancelled and nullified, and to re-enter and take possession of the demised premises as improved and every part thereof, with or without process of law, and to re-rent the demised premises at the risk and cost of the defaulting Lessee, whose default shall not relieve it of responsibility for the difference between the rent herein reserved and the rent actually received by Lessor during the term remaining after such default occurs, and/or to institute such other appropriate proceedings as Lessor may be legally entitled to employ in the premises; provided, however, anything hereinabove contained to the contrary notwithstanding, it is expressly understood that, with respect to any default (except the non-payment of rent) of such a nature that it cannot, with due diligence, be cured within a period of thirty (30) days, Lessor shall not be entitled to terminate this Lease if Lessee shall have commenced the curing of such default; it being the intention hereof that, in connection with

any default not susceptible of being cured with due diligence within thirty (30) days, the time of Lessee within which to cure the same shall be extended for such period as may be necessary to do so with all due diligence.  If proceedings shall at any time be commenced for recovery of possession as aforesaid, and compromise or settlement shall be effected, either before or after judgment, whereby Lessee shall be permitted to retain possession of the demised premises, then such proceedings shall not constitute a waiver of a condition or agreement contained herein or of any subsequent breach thereof or of this agreement.  In the event of default, Lessor's remedies shall be cumulative, and no remedy expressly provided for herein shall be deemed to exclude any other remedy allowed by law.

13.    SURRENDER OF POSSESSION UPON EXPIRATION OF TERM

Lessee shall, on or before the last day of the term hereby granted, or upon the prior termination of this Lease, peaceably and quietly leave, surrender and yield up unto Lessor the demised premises, together with the improvements thereon, free of sub-tenancies, broom clean and in good order and condition except damages for reasonable wear and tear thereof.  Should Lessee hold over the demised premises after the expiration of the term hereof, such holding over shall, in the absence of a written agreement between the parties therefore, be deemed to be a tenancy from month to month upon the same terms and conditions as contained herein.

14.  ENFORCEMENT OF LIENS

Lessor agrees to warrant, protect, and defend Lessee, its successors and assigns, from and against any and all loss or damage that Lessee may sustain by reason of the enforcement of any mortgage, deed or trust or other lien upon the demised premises; and Lessor further agrees that if foreclosure or other proceedings shall be instituted upon any such mortgage or lien, Lessor will immediately notify Lessee thereof, by registered or certified mail.

15.  LESSEE'S RIGHT TO CURE LESSOR'S DEFAULT

If Lessor defaults in the payment of any installment of principal and/or interest due under any mortgage or deed of trust

- 10 -

placed by Lessor (or Lessor's Lessor) on the demised premises, or fails to carry out any other provision which it is obligated (or allowed) to carry out under any said mortgage or deed of trust, or under the terms and conditions of this Lease, (or any underlying lease or leases,) Lessee shall have the right, in the event that such default continues for more than ten (10) days after written notice of such default sent to Lessor by Lessee, at Lessee's option, (i) to terminate this Lease or (ii) to perform such obligation which Lessor should have performed, and the costs and expenses incurred by Lessee in performing such obligation shall, together with eight (8%) percent interest thereon, (a) be promptly reimbursed by Lessor to Lessee, or (b) at Lessee's option, be offset by Lessee against the rent it is obligated to pay hereunder.

16.   SUBORDINATION TO MORTGAGES

This lease shall be subject to and subordinate to the lien of any mortgage or mortgages or deed or deeds of trust, which at any time may be placed upon the fee title to the premises above described; provided, however, that  the rights of the Lessee and its successors and assigns hereunder shall not be cut off or affected by foreclosure of any such mortgage or mortgages or deed or deeds of trust, so long as Lessee and its successors and assigns shall not be in default hereunder.

17.  LESSOR'S RIGHT TO INSPECT

Lessor shall have access to the demised premises and improvements thereon, and only in company with an agent or employee of Lessee at any and all reasonable times for the purpose of inspecting the demised premises.

18.   SUCCESSORS AND ASSIGNS

This Lease shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, personal representatives, successors and assigns.

19.   RELATIONSHIP OF LESSOR AND LESSEE

It is expressly understood that Lessor shall not be construed or held to be a partner or associate of Lessee in the conduct of its business.

- 11 -

20.   RECORDING

Lessor agrees that if so required by Lessee or regulations, it will execute for purposes of recordation in the appropriate office of the jurisdiction in which the demised premises are situated a short form of lease containing the names of the parties, the description of the demised premises, the term of the Lease, and such other provisions as either party may require. The cost and expenses of recording this Lease, or a short form thereof, including all stamp and transfer taxes, shall be borne by Lessee.

21.   GENDER AND NUMBER

Words of any gender used in this Lease shall be held to include any other gender, and words in the singular number shall be held to include the plural, when the sense arises.

22.   TITLES

The titles and article or paragraph headings are inserted only for convenience, and are in no way to be construed as a part of this Lease or as a limitation on the scope of the particular provisions to which they refer.

23.   NOTICES

All notices or demands upon the Lessor of Lessee desired or required to be given under any of the provisions hereof shall be in writing. Any notices or demands from the Lessor to the Lessee shall be deemed to have been duly and sufficiently given if a copy thereof has been mailed by U. S. Registered or Certified Mail in an envelope properly stamped and addressed to the Lessee at    311 North Lindbergh, St. Louis, Missouri 63141, or at such other address as Lessee may theretofore have furnished by written notice to the Lessor; and any notices or demands from the Lessee to the Lessor shall be deemed to have been duly and sufficiently given if mailed by U. S. Registered or Certified Mail in an envelope properly stamped and addressed to the Lessor at    Box 370, Mahomet, IL 61853 or at such other address as Lessor may theretofore have furnished to Lessee by written notice.

- 12 -

24. WAIVER

The failure of Lessor or Lessee to insist upon strict performance of any of the covenants or conditions of this Lease or to exercise any option herein conferred in any one or more instances shall not be construed as a waiver or relinquishment for the future of any such covenant, condition or option, but the same shall be and remain in full force and effect; and it is further agreed that the acceptance by Lessor of rent from Lessee, with knowledge of the existence of a breach of this Lease by Lessee shall not constitute a waiver of such breach, nor a waiver of the right of Lessor to insist upon Lessee's curing such breach or default.

25. PURCHASE OPTION - RIGHT OF REFUSAL

Lessee shall have at any time during the original term of this lease, or any extension thereof, the option to purchase the demised premises at fair market value as determined by agreement or appraisal as hereafter provided, but for no less than the sum of ........ One Hundred Sixty Thousand ............ Dollars ($ 160,000.00 ). Upon written notice of Lessee to Lessor of its determination to exercise this option, the parties shall seek agreement on the option price. If no such agreement can be reached within thirty (30) days of such notice then Lessor and Lessee shall each appoint within ten (10) days one appraiser from the community wherein the demised premises are located and if said appraisers are unable to agree within thirty (30) days of their appointment upon the fair market value of the premises, then they shall immediately appoint a third appraiser. The decision of any two of such appraisers shall be conclusive as to the fair market value of the demised premises with respect to this paragraph. Lessee's election to exercise the purchase option shall be by written notice to Lessor within forty-five (45) days after the option price has been determined whether by agreement or appraisal.

If, anything to the contrary herein notwithstanding, during the term hereof or any extension, Lessor or Lessor's successor in interest shall receive an acceptable offer for the sale of the demised premises or for a lease to commence upon the expiration or earlier termination of this lease, Lessor prior to acceptance shall give Lessee notice of such offer and Lessee shall have sixty (60) days from receipt of Lessor's notice to elect to purchase or lease the premises, as the case may be, on the terms of said offer.  Lessee's failure to exercise this right of first refusal shall not affect this lease or the continuance of Lessee's rights and options herein.

26.  ENTIRE AGREEMENT

This instrument contains all the agreements and conditions made between the parties hereto and may not be modified orally or in any other manner other than by an agreement in writing, signed by all the parties hereto or their respective successors in interest.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals the day and year first hereinabove written.

LESSOR
BY

Attest:

_____
Secretary

LESSEE
HEN HOUSE INTERSTATE, INC.

(Corporate Seal)

Attest:

_____
Secretary

VICE PRESIDENT

- 14 -

SUPPLEMENT TO LEASE

DATED _____ 19 __ BY AND BETWEEN _____, LESSOR,

AND HEN HOUSE INTERSTATE, INC., LESSEE

 

In accordance with Paragraph 1 A of the foregoing Lease, the terms of said Lease shall commence on the ___18ᵗʰ___ day of ___JULY___ 19 75 and expire on the ___31ˢᵗ___ day of ___JULY___ 19 95.

 

LESSOR
BY

_Rob. A. Gays_
_Jacqueline M. Taylor_

Attest:

_____
Secretary

(Corporate Seal)

LESSEE
HEN HOUSE INTERSTATE, INC.

_[signature]_ VP

ACKNOWLEDGEMENT

STATE OF _Illinois_ )
                   ) SS:
COUNTY OF _Champaign_ )

I, _Russell H. Taylor_ , a Notary Public in and for the
County and State aforesaid, DO HEREBY CERTIFY that _R. C. Taylor and_
Jacqueline N. Taylor~~President and Secretary~~ ~~corporation~~
who are personally known to me to be the same persons whose names
are subscribed to the foregoing instrument as such _R. C. Taylor and Jacqueline_
~~President and Secretary respectively~~, appeared before me this day in N. Taylor
person and acknowledged that they signed, sealed and delivered the
said instrument as their free and voluntary act, and as such _R. C. Taylor,_
and Jacqueline N. Taylor,
~~President and Secretary respectively~~, and as the free and voluntary
act ~~of~~ _____ , for the uses and purposes
therein set forth.

GIVEN under my hand and notarial seal this _18th_ day of _March_ ,
19_75_.

_____
Notary Public

ACKNOWLEDGEMENT

STATE OF _Missouri_ )
                   ) SS:
COUNTY _Jefferson_ )

I, _Fred T. Luleff_ , a Notary Public in and for the
County and State aforesaid, DO HEREBY CERTIFY that _Larry R. Rugg, James G._
_Hatcher, Vice_ President, and Secretary of _Hen House Interstate, Inc._
_____ , a _Delaware_ corporation, who are
personally known to me to be the same persons whose names are
subscribed to the foregoing instrument as such _Vice_ President
and Secretary respectively, appeared before me this day in person
and acknowledged that they signed, sealed and delivered the said
instrument as their free and voluntary act, and as such _Vice_
President and Secretary respectively, and as the free and voluntary
           Hen House
act of _Interstate, Inc_ for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _26_ day of _February_ 19_75_.

_____
Notary Public

EXHIBIT "A"

Legal Description for Lease Purposes

That part of the N½ of Section 15, Township 20 North, Range 7 East of the 3rd Principal Meridian described as follows:

Commencing 34 rods 8 link (566.28 feet) South of the Northeast Corner of the Northwest Quarter of the Southwest Quarter of the Northeast Quarter of Section 15, Township 20 North, Range 7 East of the Third Principal Meridian; thence running 212.50 feet West; thence North 137.28 feet; thence West 48.50 feet; thence North 192.83 feet; thence South 89° 53' 15" West 400 feet to an iron pin monument, the Northeast Corner of Sunoco Service Station property as shown on a plat of survey dated July 19, 1967, done by John Delbert Goodell, Registered Illinois Land Surveyor No. 1462 for Mr. R. C. Taylor; thence North 69° 31' 10" West to the Northwest Corner of said Sunoco Service Station Property also being on the East Right-of-Way Line of State Route 47 (S.B.I. Route 10); thence North 26° 52' 50" East 60.38 feet on said East Right-of-Way, to the point of beginning; thence continuing North 26° 52' 50" East 169.01 feet, on said East Right-of-Way Line; thence North 28° 49' 50" East 101.06 feet, on said East Right-of-Way Line to a point on the Southeasterly Right-of-Way Line of the Access Ramp of Interstate Route 74; thence South 82° 38' 51" East 102.36 feet, on said Southeasterly Right-of-Way Line of the Access Ramp of Interstate Route 74; thence South 0° 06' 45" West 249.71 feet, to the North Line of an Access Easement; thence South 89° 53' 15" West 163.30 feet, on said North Line; thence North 69° 31' 10" West 68.17 feet, on said North Line to the Point of Beginning, containing 1.000 Acres and situated in Champaign County, Illinois.

For: Mr. Russ Taylor
February 19, 1975

*D. Wayne Shoemaker*

D. Wayne Shoemaker
Registered Illinois Land Surveyor
No. 1684

Bazzell-Phillips & Assoc., Inc.
1305 South Mattis Ave.
Champaign, Ill. 61820

STATE OF ILLINOIS
D. WAYNE
SHOEMAKER
No. 1684
REG. LAND SURVEYOR

## AMENDMENT TO LEASE

This agreement entered into this 14th day of August, 1979, by and between ROBERT C. TAYLOR and JACQUELINE N. TAYLOR, Lessor, and HEN HOUSE INTERSTATE, INC., Lessee.

WHEREAS, the parties hereto entered into a Lease dated March 18, 1975, wherein Lessor leased to Lessee approximately one acre on which a Hen House Restaurant is located in Mahomet, Illinois; and

WHEREAS, the parties desire to amend certain provisions of said lease as herein noted.

NOW THEREFORE, in consideration of the mutual covenants hereinafter set forth, the within parties agree as follows:

a)  That paragraph 6 of the lease agreement dated March 18, 1975, is hereby amended to read:

6.  Taxes and Assessments.  Lessor agrees to pay all real estate taxes and assessments imposed which become due and payable in connection with the within demised premises accrued during the term of said lease.  Lessee shall reimburse Lessor one-half of such taxes and assessments paid by Lessor, applicable and assessed against the subject premises for real estate tax year 1978, payable in 1979 and all subsequent years of the term hereof.  Lessee shall make said reimbursement to Lessor within 30 days of receipt of Lessor's written notice of the amount payable by Lessee.  Said taxes will be prorated to reflect the actual period of occupancy by Lessee.

b)  That the first sentence of paragraph 7 of said lease agreement dated March 18, 1975, is hereby amended to read:

7.  Lessee agrees that it shall have the use of the aforesaid premises for purposes of operating a restaurant/gift shop and a self-service gas station located thereon, and for no other purposes without the written consent of Lessor, and Lessor hereby retroactively consents to the remodeling previously accomplished by Lessee for the purpose of converting to self-service gasoline dispensing facilities.

c)  All other terms and provisions of said lease shall remain in full force and effect except as herein specifically amended.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals the day and year first hereinabove written.

_____
ROBERT C. TAYLOR

_____
JACQUELINE N. TAYLOR

(Lessor)

HEN HOUSE INTERSTATE, INC.

BY: _____ VP

ATTEST: _____ Sec.

(Lessee)

SENDER:
☐ Complete items 1 and/or 2 for additional services:
Complete items 3, 4a, and 4b.
☐ Print your name and address on the reverse of this form so that we can return this card to you.
☐ Attach this form to the front of the mailpiece, or on the back if space does not permit.
☐ Write "Return Receipt Requested" on the mailpiece below the article number.
☐ The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the follow-ing services (for an extra fee):

1. ☐ Addressee's Address
2. ☐ Restricted Delivery

3. Article Addressed to:

Mr. Russell Taylor
101 S. Lincoln
Mahomet, IL 61853

*Beian Hathell*

5. Received By: (Print Name)

6. Signature (Addressee or Agent)

4a. Article Number

P 898 396 585

4b. Service Type
☐ Registered        ☒ Certified
☐ Express Mail      ☐ Insured
☐ Return Receipt for Merchandise  ☐ COD

7. Date of Delivery

12 10 99

8. Addressee's Address (Only if requested and fee is paid)

is, MO 63005-6201
-5250 (Fax) • 314-746-9654 ( Message Center )

Thank you for using Return Receipt Service.

PS Form 3811, December 1994     102595-99-B-0223     Domestic Return Receipt

---

Mr. Russell Taylor
Taylor Realty
101 S. Lincoln
Mahomet, IL 61853

CERTIFIED MAIL #P 898 396 585

RE: Lease dated July 18, 1975 between
Robert C. Taylor and Jacqueline N. Taylor
as Lessor and Hen House Interstate, Inc.
as Lessee and pertaining to the Hen House
Restaurant located in Mahomet, IL.

Dear Russ,

Restaurants Unlimited, Inc. as ASSIGNEE of the entire LESSEE
interest in the above referenced lease does hereby exercise
its rights given it under Paragraph 1.B. of said lease by
herewith notifying Lessor of its intent to extend the term by
the second five year extension period granted. In accordance
with the SUPPLEMENT TO LEASE the original term shall expire
on July 31, 1995. The six month minimum notice period having
been met, the lease is hereby extended to July 31, 2005.

Sincerely yours,

Larry R. Rugg
President

LRR/jat

# THOMPSON COBURN

*Thompson Coburn LLP*
*Attorneys at Law*

One US Bank Plaza
St. Louis, Missouri 63101
314-552-6000
FAX 314-552-7000
www.thompsoncoburn.com

March 17, 2005

Steven D. Graham
314-552-6041
FAX 314-552-7041
EMAIL sgraham@
thompsoncoburn.com

**CERTIFIED MAIL**

Jacqueline N. Taylor
c/o Russell Taylor
Taylor Realty
101 S. Lincoln
Mahomet, IL 61853

Re:    **Lease dated on or about March 18, 1975 and effective as of July 18, 1975 (as amended, the "Lease") by and between Robert C. Taylor and Jacqueline N. Taylor as "Lessor" and Hen House Interstate, Inc. as "Lessee" and pertaining to that certain Property described therein as the "Demised Premises" located in the County of Champaign and the Village of Mahomet, Illinois, commonly known as the "Hen House Restaurant"**

Dear Ms. and Mr. Taylor:

This firm represents Restaurants Unlimited, Inc. ("Tenant"), successor in interest to the above-referenced original Lessee under the Lease. On behalf of Tenant, we are writing to notify you of Tenant's determination to exercise its option, pursuant to Section 25 of the Lease, to begin proceedings towards a purchase of the demised premises by Tenant at fair market value. Tenant would like to reach an agreement with you as to value, and to avoid the potential cost of having to perform three appraisals. It is Tenant's opinion that the fair market value of the demised premises is $250,000. A copy of the appraisal prepared by James H. Webster, MAI, SRA for this purpose is enclosed for your reference.

We are also attaching a survey of the demised premises for your review. Tenant's offer assumes that appropriate easements for access, and full rights to use all areas and signage shown on the survey are in place and enforceable, in order to fully preserve the existing use of the demised premises. This offer also assumes that Tenant shall have no liability for the current environmental condition of the demised premises or any remediation or other "clean-up" activities that may be required in connection therewith (all of which shall be your sole and continuing responsibility to complete as current owner of the demised premises, to the full extent

3093789

EXHIBIT
B
PENGAD 800-631-6989

March 17, 2005
Page 2

required by the Illinois Environmental Protection Agency), but rather that the demised premises is free of contaminants and in full compliance with all environmental and other applicable laws pertaining thereto.

Please contact me at your earliest convenience to discuss these maters.  We look forward to hearing from you soon.

Very truly yours,

Thompson Coburn LLP

By

    Steven D. Graham

SDG/cr

cc: Mr. Larry Rugg

3093789



**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

Postage | $
Certified Fee
Return Reciept Fee
(Endorsement Required)
Restricted Delivery Fee
(Endorsement Required)
Total Postage & Fees | $

Postmark
Here

LOUIS, MO
MAR 17 2005
USPS

Sent To

Jacqueline N. Taylor
c/o Russell Taylor
Taylor Realty
101 S. Lincoln
Mahomet, IL 61853

Street, Apt. No.;
or PO Box No.
City, State, ZIP+4

7004 1160 0005 7803 4103

PS Form 3800, June 2002                   See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Jacqueline N. Taylor
c/o Russell Taylor
Taylor Realty
101 S. Lincoln
Mahomet, IL 61853

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____ ☐ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
3-22-05

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)       7004 1160 0005 7803 4103

PS Form 3811, February 2004       Domestic Return Receipt       102595-02-M-1540

E-FILED
Monday, 21 August, 2006  11:35:20 AM
Clerk, U.S. District Court, ILCD

James H. Webster
& ASSOCIATES, LTD.

EXHIBIT

C

PENGAD 800-831-6989



# James H. Webster & Associates, Ltd.

104 West University Avenue, Suite B
Urbana, Illinois 61801-1723
Phone  (217) 344-0973
Fax     (217) 344-7506
e-mail:  office@websterappraisals.com

January 20, 2005

Mr. Larry Rugg
Restaurants Unlimited, Inc.
13 Deerfield Ridge Road
St. Louis, MO 63005

RE:     700 Eastwood Drive, Mahomet, Illinois

Dear Mr. Rugg:

I have personally inspected the property known as 700 Eastwood Drive, Mahomet, Illinois, legally described in the summary report herein.

The purpose of this appraisal is to provide an opinion of the Market Value of the subject real property as of January 10, 2005.  The function of the appraisal will be to serve as a guide in loan underwriting.  Use of this report by any other persons or for any other purpose is not permitted without prior written approval from James H. Webster & Associates, Ltd.

*Comparable Rentals were not used to arrive at an estimate of Market Rent and, therefore, the appraisal process involves Departure from Standards Rule 1-4 (c)(i) of the Uniform Standards of Professional Appraisal Practice and is termed a Limited Appraisal.*

The property was appraised based on fee simple ownership and unencumbered, subject to the contingent and limiting conditions outlined herein.



**James H. Webster**
**& Associates, Ltd.**

Mr. Larry Rugg
January 20, 2005
Page 2

Limited Appraisal of 700 Eastwood, Mahomet, Illinois

It is my opinion that the Market Value of the subject real property, as of January 10, 2005, was:

TWO HUNDRED FIFTY THOUSAND ($250,000) DOLLARS.

The opinion of value is subject to the site being free of contaminants.

This transmittal letter is followed by the summary appraisal report further describing the subject property and containing the reasoning and pertinent data leading to the opinion of value. Also attached are the Certification of the appraisal, Limiting Conditions, Photographs and other addenda that are considered relevant to the appraisal. This letter and all attachments are integral parts of the appraisal report, and the entire document must be considered as a whole.

Respectfully Submitted,

James H. Webster, MAI, SRA
Illinois Certified General
Real Estate Appraiser #153.0000270

JHW:rs

f:\05-19715

# SUMMARY APPRAISAL REPORT – LIMITED APPRAISAL

**CLIENT:**     Mr. Larry Rugg
Restaurants Unlimited, Inc
13 Deerfield Ridge Road
St. Louis, MO  63005-6201

**APPRAISER:**     James Webster, MAI, SRA
James H. Webster & Associates, Ltd.
104 West University Avenue
Urbana, Illinois  61801

**SUBJECT:**     700 E. Eastwood Drive
Mahomet, Illinois  61853

## PURPOSE OF THE APPRAISAL:

The purpose of the appraisal is to provide the appraiser's opinion of the Market Value of the subject real property as of January 10, 2005.

*Market Value* is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeable, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

(1)     buyer and seller are typically motivated;
(2)     both parties are well informed or well advised, and acting in what they consider their own best interests;
(3)     a reasonable time is allowed for exposure in the open market;
(4)     payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
(5)     the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

(Source:  Office of the Comptroller of the Currency under 12 CFR, Part 34, Subpart C-Appraisals, 34.42 Definitions [f])

## INTENDED USE OF REPORT:

The function of the appraisal is to assist the client, Mr. Larry Rugg, Restaurants Unlimited, Inc, as a guide for negotiations in exercising an option to purchase.

*James H. Webster & Associates, Ltd.*        2

| | |
|---|---|
| **INTEREST VALUED:** | Fee Simple Estate |
| **EFFECTIVE DATE OF VALUE:** | January 10, 2005 |
| **DATE OF REPORT:** | January 20, 2005 |

**APPRAISAL DEVELOPMENT AND REPORTING PROCESS:** In the preparation of this appraisal, your appraiser:

1. inspected the subject site as well as the exterior and interior of the improvements;
2. applied the Cost Approach to arrive at an indication of value;
3. applied the Income Capitalization Approach to arrive at an indication of value without utilizing comparable rentals;
4. gathered and confirmed data on comparable improved sales;
5. applied the Sales Comparison Approach to arrive at an indication of value.

Per prior agreement with the client, comparable rentals were not utilized to arrive at an estimate of Market Rent in the Income Approach. Therefore, the appraisal process involved departure from Standards Rule 1-4(c)(i), and this is a Limited Appraisal.

The Summary Appraisal Report is a brief summary of your appraiser's data, analyses, and conclusions that is intended to comply with Standard 2-2(b) of the Uniform Standards of Professional Appraisal Practice. Additional support is retained in your appraiser's files.

**DESCRIPTION OF REAL ESTATE APPRAISED:**

**Location Description.**

The subject property is located in a commercial district on the northeast edge of Mahomet. It represents the primary commercial center for Mahomet, Illinois. An area analysis of Mahomet has been omitted but it may be provided upon request. The key statistic for this community is the growth which occurred between 1990 and 2000. According to the US Census the population increased from 3,103 in 1990 to 4,877 in 2000. However, Mahomet is a bedroom community which is approximately six miles west of Champaign-Urbana and it has many outlying developments. Therefore, growth is not reflected by the population in Mahomet. Although residential growth and building continues the level of activity has moderated.

The commercial neighborhood or district is concentrated on Route 47 or Lombard which is the primary north/south street in the community which has an exit on I-74. There is approximately a two block radius south of I-74 which has a mix of commercial uses including restaurant, service station/convenience store and office along with a school. Eastwood Drive is a frontage type road which extends eastward from Lombard. Its primary use is a strip and neighborhood center along with a motel, restaurant and garden center. There is also a new small strip center which is nearing completion immediately south of the subject property. There has been some re-development of older

buildings in favor of new facilities. The neighborhood is nearly fully developed although re-development is likely to continue.

## Property Description.

The site being appraised is irregular but nearly trapezoidal in shape with measurements of 163.3 x 31.17 x 40.48 x 294.57 x 102.36 x 249.72 feet or containing a total of 43,182.77 square feet. It is nearly level in topography and at street grade. Drainage appears to be adequate and the site is not located in a flood hazard area according to FEMA map 1170029 dated June 15, 1983. Gas, electricity, water and sewer are all available to the site. The site is located on the northeast corner of Lombard and Eastwood, both of which are two-lane, two-way asphalt covered streets with concrete curbs and gutters on Lombard. There is access to the site from Eastwood. The site has good visibility and access including exposure to I-74. According to a 2003 survey by the Illinois Department of Transportation the average daily traffic count at the site was 9,400. The site has been improved with asphalt parking for +/- 40 vehicles. It also has a hi-rise sign for Interstate exposure. The parking lot is in fair condition.

It was reported that the site was affected by a gasoline leak and required clean-up and a release letter from the EPA. The opinion of value will be subject to the site being free of contaminants.

The site has also been improved with a frame building that was constructed in approximately 1975 and continues to operate as a Hen House restaurant. It is a prototype design which has been replicated in several other locations which are known in Illinois and all are situated on Interstate highways. The building is frame and it contains approximately 2,080 square feet. It has concrete block foundation, wood exterior walls, fixed-pane windows and an asphalt shingle roof designed in a mansard style.

The interior has been finished out with carpeted flooring, wood walls and ceilings which have a semi-rustic décor. The building has an air-lock entry, dining area which has incandescent lighting and can accommodate approximately 60 patrons, waiter station, cashier which has an adjoining small retail area. There are two bathrooms which do not appear to meet ADA standards. The kitchen is open and is adjoined by a storage area along with a walk-in cooler and freezer. There is also an exterior room which was reported to be exterior bathrooms although these are not in use at this time.

The building is in average to fair condition. The roof appears to be approaching the end of its useful life and flooring, particularly in the kitchen area, is in need of replacement as well. Therefore, updating is needed. However, the facility continues to serve this market which is evidenced by historical sales.

There is good visibility and access to the site. There is adequate parking with a ratio of one space per 51 square feet. Further, the land to building ratio is 20.73:1.

*James H. Webster & Associates, Ltd.*    4

**Legal Description of Property:**

The subject is legally described as:

Commencing at a concrete monument found situated at the intersection of the south line of Eastwood Street, Village of Mahomet and the west line of Illinois Route 47 situated in the north half of section 15, Township 20 North, Range 7 East, of the Third Principal Meridian, Village of Mahomet, Champaign County, Illinois; thence north on an assumed bearing of north 26° 49' 48" east, a distance of 60.39 feet to an iron rod monument set at the point of beginning at the intersection of said east line of Route 47 and the north line of said Eastwood Street; thence north 26° 52' 50" east, along said east right of way, a distance of 169.01 feet to an iron rod monument set; thence north 28° 49' 50" east, along said east right of way line, a distance of 101.06 feet to an iron rod monument set on the southeast right of way in Interstate 74; thence south 82° 38' 51" east, along said southeast right of way line, a distance of 102.36 feet to an iron rod monument set on a line perpendicular to the aforesaid north right of way line of Eastwood Street; thence south 00° 06' 45" east, along said right of way line, a distance of 249.72 feet to an iron rod set on said north right of way line of Eastwood Street; thence south 89° 53' 15" west, along said north right of way line, a distance of 163.30 feet to a P.K. nail set in a cut cross; thence north 69° 30' 59" west along said north right of way line, a distance of 68.17 feet to the point of beginning, containing 43,570.77 square feet (1.000 acres), more or less, and all situated within the limits of the Village of Mahomet, Champaign County, Illinois.

EXCEPT:

Part of the Southeast Quarter of the Northwest Quarter of Section 15, Township 20 North, Range 7 East of the Third Principal Meridian, situated in the County of Champaign in the State of Illinois described as follows:

Commencing at a found iron pipe set in concrete at the intersection of the southerly right of way line of Eastwood Drive and the easterly right of way line of FAP 326 (Il. Rte. 47); thence north 26° 46' 08" East (Bearings based on Illinois State Plane Coordinates, East Zone NAD 83) 18.413 meters (60.41 feet) along the extended easterly right of way line of FAP 326 (Il. Rte. 47), to the intersection with the northerly right of way line of Eastwood Drive, said point being the Point of Beginning; thence North 26° 56' 13" East 6.401 meters (21.00 feet) along the easterly right of way line of FAP 326 (Il. Rte. 47); thence South 38° 28' 05" East 12.337 meters (40.48 feet) to the northerly right of way line of Eastwood Drive; thence North 69° 30' 34" West 11.278 meters (37.00 feet) along said right of way line, to the Point of Beginning, containing 36 square meters (388 square feet), more or less.

*James H. Webster & Associates, Ltd.*                                                     5

## HIGHEST AND BEST USE:

The current zoning classification for the subject property is C-2, Commercial.

**Highest and best use as vacant.**          Commercial

**Highest and best use as improved.**        Present Use

## MARKETING TIME:

The estimated exposure time (i.e., the length of time the property would be exposed for sale in the market had it sold at the market value concluded in this analysis as of the date of this valuation) would be approximately 30 to 720 days, with 360 days typical. The estimated marketing time (i.e., the amount of time it would probably take to sell the subject property if exposed in the market beginning on the date of this valuation) is also estimated to be 30 to 720 days, with 360 days considered typical.

## OWNERSHIP HISTORY:

The subject property is currently in the name of Jacqueline Taylor. There has been no transfer of ownership on record over the past three years, and the property is not available for sale at this time. However, it has been leased since 1975 with an option to purchase although the option price has yet to be determined.

## LAND VALUE ESTIMATE

There are six recognized procedures used to determine land value which include sales comparison, allocation, extraction, subdivision development, and land and ground rent capitalization. All six techniques utilize the three basic approaches to value. The Sales Comparison Approach is the most often used technique and is preferred if sales data is available. There are adequate land sales available, and therefore, this approach will be used for valuing the subject's site. Sales of land that are considered to contain the same salient characteristics as the subject were collected. The sales on the following pages are considered to be most similar to the subject.

*James H. Webster & Associates, Ltd.*      6

*LAND SALE #1*

| | |
|---|---|
| LOCATION | 201 and 205 N Lombard, 606 Franklin<br>Mahomet, IL |
| GRANTOR | Hammett, Provine and Miller |
| GRANTEE | ILLICO, Inc. |
| DATE OF SALE | September 1998, March 1999 and June 1999 |
| RECORDING | Documents 98R32334, 99R8298 and 99R16611 |
| SALE PRICE | $251,800 |
| LAND AREA | 52,987 SF |
| ZONING | C-2 |
| SALE PRICE/SF | $4.75 |
| COMMENTS | This represents the sale of three adjoining parcels that have been assembled for a new commercial property on the northwest corner of Lombard (Route 47) and Franklin. |

*James H. Webster & Associates, Ltd.* 7

*LAND SALE #2*

| | |
|---|---|
| LOCATION | 701-703 Eastwood<br>Mahomet, IL |
| GRANTOR | Russell Taylor |
| GRANTEE | KES Properties LLC |
| DATE OF SALE | August 2004 |
| RECORDING | Document 2004R23340 |
| SALE PRICE | $229,000 |
| LAND AREA | 43,200 SF |
| ZONING | C-2 |
| SALE PRICE/SF | $5.30 |
| COMMENTS | This parcel is located east of Route 47 and south of I-74. It has been improved with a new strip center. |

*LAND SALE #3*

| | |
|---|---|
| LOCATION | Prairieview and Tin Cup Road<br>Mahomet, IL |
| GRANTOR | Midland Corporation |
| GRANTEE | Casey's General Store |
| DATE OF SALE | December 1997 |
| RECORDING | Document 97R02206 |
| SALE PRICE | $110,000 |
| LAND AREA | 30,624 SF |
| ZONING | C-2 |
| SALE PRICE/SF | $3.59 |
| COMMENTS | This parcel is located on the southeast corner of Prairieview and Tin Cup Roads, northeast of Mahomet. It is north of the interchange with Interstate 74. It has been improved with a Casey's General Store. |

*LAND SALE #4*

| | |
|---|---|
| LOCATION | Route 150 and Prairieview Road |
| | Mahomet, IL |
| | |
| GRANTOR | Jo-Nell's Commons |
| GRANTEE | McDonald's Corporation |
| DATE OF SALE | July 2000 |
| RECORDING | N/A |
| SALE PRICE | $257,362 |
| LAND AREA | 58,893 SF |
| ZONING | C-2 |
| SALE PRICE/SF | $4.37 |

COMMENTS     This represents the sale of Lot 9 in Jo-Nell's Subdivision, which is situated on the northwest corner of Route 150 and Prairieview Road, south of the interchange with I-74. It has been improved with a new McDonald's restaurant.

*James H. Webster & Associates, Ltd.*    10

## SUMMARY OF LAND SALES

| Sale | SP/SF | Date of Sale | Size (SF) | Zoning/Use |
|------|-------|-------------|-----------|-----------|
| 1 | $4.75 | 09/98-06/99 | 52,987 | C-2/Gas Station/CS |
| 2 | $5.30 | 12/2004 | 43,200 | C-2/Strip Center |
| 3 | $3.59 | 12/1997 | 30,625 | C-2/Casey's |
| 4 | $4.37 | 06/2000 | 58,893 | C-2/McDonald's |

## ADJUSTMENT GRID

| Sale | 1 | 2 | 3 | 4 |
|------|---|---|---|---|
| SP/SF | $4.75 | $5.30 | $3.59 | $4.37 |
| Date of Sale | Inferior +18% | Similar | Inferior +21% | Inferior +13% |
| Time Adj SP/SF | $5.61 | $5.30 | $4.34 | $4.94 |
| Location | Similar | Similar | Inferior | Similar |
| Size | Similar | Similar | Superior | Similar |
| Exposure/Access | Similar | Similar | Inferior | Similar |
| Net | Similar | Similar | Inferior | Similar |

The sales shown above represent a range of sale prices per square foot varying between $3.59 and $5.30. There were no specific adjustments made with the exception of time, which was made initially based upon 3% appreciation per year. Other areas of comparison include location, size and exposure/access. The size adjustment reflects an inverse relationship between size and price, with smaller parcels selling at a higher unit cost. A brief description of each comparable as it relates to the subject is as follows:

Land Sale #1 is considered to be a good comparable although it required a significant adjustment for time.. The subject property is south of I-74 and the subject property but it is considered to be similar in all respects.

Land Sale #2 represents a recent sale immediately south of the subject property and no adjustments were necessary.

Land Sale #3 represents a corner lot that is farther away from the Downtown and Interstate, both of which were reflected by inferior ratings. However, it is smaller in size.

Land Sale #4 is situated close to the next eastbound I-74 exit. It was improved with a McDonald's restaurant. It requires a turn from I-74 to Prairieview and, subsequently, to Route 150 but both location and exposure were considered to be similar.

With emphasis given to Land Sales #1 and #2, a unit value of $5.00 per square foot was established for the subject property.

Therefore,

| | | |
|---|---|---|
| 43,183 Square Feet @ $5.00/Square Foot | = | $215,915 |
| Say | | $215,000 |
| MARKET VALUE OF SITE | = | $215,000 |

## COST APPROACH

The next step of the Cost Approach is to estimate the Replacement Cost New of the facility. Replacement Cost New is defined as:

> "The estimated cost to construct, at current prices as of the effective appraisal date, a building with utility equivalent to the building being appraised, using modern materials and current standards, design and layout."[1]

Costs that relate to the construction of a physical improvement are referred to as "Direct or Hard Costs." Costs relating to the expenditures that are necessary for construction, but not normally included in the construction contract, are referred to as "Indirect or Soft Costs." Examples of Indirect Costs include title insurance, architectural fees, financing charges during the interim period, and sales or marketing commissions. In addition to the Direct and Indirect Costs, Entrepreneurial Profit must be included as a cost. This market driven amount represents the risk and expertise involved with the project.

There are several cost data sources that can be employed to determine the Replacement Cost New of the subject property. Actual historical costs incurred represent the best source. However, actual costs of other similar properties known to your appraiser are considered to be the next best source if historical costs are not known. Cost publication services may also be employed to determine an estimate of Replacement Cost New. Your appraiser uses the Marshall and Swift Publication Company with costs updated on a monthly basis.

There are several methods for cost estimating which include the Comparative-Unit Method, Unit-in-Place Method, and the Quantity Survey Method. The Comparative-Unit Method is regarded as the most straight forward and practical method. This method will be employed in this report, with the unit price calculated on a per square foot basis. The cost estimate includes both the hard and soft costs, but excludes profit.

---

[1] *The Dictionary of Real Estate Appraisal*, Third Edition, The Appraisal Institute, 1993.

*James H. Webster & Associates, Ltd.*     13

## REPLACEMENT COST NEW - ESTIMATE

**BUILDING SUMMARY**

| | | | |
|---|---|---|---|
| Section | 13 | Marshall Valuation Service Base Cost | $79.55 |
| Page | 14 | Modifications: | |
| | | Heating | $0 |
| Class | D | Air Conditioning | $0 |
| Type | Restaurants | | |
| Building Life | 40 | Subtotal | $79.55 |
| Effective Age | 30 | Current | 1.09 |
| | | Local | 1.03 |
| Quality | Average | | |
| Year Built | 1975 | ADJUSTED COST | $89.31 |

*James H. Webster & Associates, Ltd.* _____ 14

**REPLACEMENT COST NEW**

Building -2,050 Square Feet @ $89.31/SF                    $183,086

Less Depreciation:

| | | | |
|---|---|---|---|
| Physical | | | |
| Curable | $ 0 | | |
| Incurable | $137,315 | | |
| | | $137,315 | |
| | | | |
| Functional | | | |
| Curable | $ 0 | | |
| Incurable | $ 0 | | |
| | | $ 0 | |
| | | | |
| External | | | |
| Locational | $ 0 | | |
| Economic | $ 0 | | |
| | | $ 0 | |

Depreciation From All Sources                              $137,315

Depreciated Value of Improvements                          $ 45,771

Value of Site Improvements                                 $ 20,000

Depreciated Value of all Improvements                      $ 65,771

Land Value                                                 $215,000

Total                                                      $280,771

Say                                                        $280,000

**VALUE BY THE COST APPROACH**                            $280,000

## Depreciation

Depreciation is defined as "(1) In appraising, a loss in property value from any cause; the difference between the reproduction or replacement cost of an improvement on the effective date of the appraisal and the market value of the improvement on the same date. (2) In regard to improvements, deterioration encompasses both deterioration and obsolescence. (3) In accounting, an allowance made against the loss in value of an asset for a defined purpose and computed using a specified method". The Dictionary of Real Estate Appraisal, Third Edition, Appraisal Institute.

Definitions of these types of depreciation are as follows:

Physical Deterioration - "An element of accrued depreciation."[2] For purposes of appraisal analysis, it is most common and convenient to divide physical deterioration into curable and incurable components.

Physical Curable Deterioration:

> Physical deterioration which the prudent buyer would anticipate correcting upon purchase of the property. The cost of effecting the correction or cure would be no more than the anticipated addition to utility, and hence ultimately to value, associated with the cure. Curable physical deterioration is frequently termed "deferred maintenance" or rehabilitation, because these terms reflect the type of activity typically associated with correcting the condition.[3]

Physical Incurable Deterioration:

> Physical deterioration which in terms of market conditions as of the date of the appraisal is not feasible or economically justified to correct. The cost of correcting the condition or effecting a cure is estimated to be greater than the anticipated increase in utility, and hence ultimately in value, of the property that will result from correcting or curing the condition. For purposes of appraisal analysis, incurable physical deterioration may be divided into short-lived and long-lived elements.[4]

---

[2] The Dictionary of Real Estate Appraisal, 3rd Edition, by the Appraisal Institute, 1993, p. 185.

[3] Ibid., 185.

[4] Ibid., 185.

Functional Obsolescence:

> Impairment of functional capacity or efficiency. Functional obsolescence reflects the loss in value brought about by such factors as defects, deficiencies, or superadequacies, that affect the property item itself or its relation with other items comprising a larger property. The inability of a structure to perform adequately the function for which it is currently employed.[5]

External Obsolescence:

> Impairment of desirability or useful life arising from factors external to the property, such as economic forces or environmental changes which affect supply-demand relationships in the market. Loss in the use and value of a property arising from factors of economic obsolescence is to be distinguished from loss in value from physical deterioration and functional obsolescence, both of which are inherent in the property.[6]

Physical Deterioration

There were no items of deferred maintenance noted. Therefore, physical deterioration was limited to incurable. Incurable physical deterioration was made by the Age/Life method. The calculations were based on a percentage that is derived by dividing the effective age by the total economic life (30/40 = 75%).

Functional Obsolescence

There was no curable or incurable functional obsolescence.

External Obsolescence

There was no external obsolescence either in the form of locational or economic.

---

[5] Ibid., 114.

[6] Ibid., 87.

*James H. Webster & Associates, Ltd.*                                                      17

## INCOME CAPITALIZATION APPROACH

The Income Capitalization Approach is based on the understanding that there is present worth to future rights of income. Operating expenses are deducted from the Gross Operating Income to determine a Net Operating Income which is capitalized into value. The capitalization rate is market oriented, and it takes into consideration the return on and return of the capital expenditure.

## RECONSTRUCTED INCOME STATEMENT

| | |
|---|---|
| Gross Operating Income | $20,200 |
| Plus: Overage | $ 7,000 |
| Total | $27,200 |
| Less: Vacancy and Collection Losses 5% | $ 1,360 |
| Effective Gross Income | $25,840 |

Less: Operating Expenses

| | | |
|---|---|---|
| Management | $775 | |
| Professional | $500 | |
| Miscellaneous | $500 | |
| Reserves for Replacement | $410 | |
| | | |
| Total Operating Expenses | | $ 2,185 |
| | | |
| Net Operating Income | | $23,655 |

*James H. Webster & Associates, Ltd.*                                    18

**Capitalization Process:**

Based upon the property's location and age as well as prevailing market conditions, typical mortgage terms would be as follows:

| | |
|---|---|
| $Y_m$ (Mortgage Interest Rate) | = 7% |
| M (Loan-Value Ratio) | = 75% |
| Amortization Period | = 20 years |
| (Balloon) | = years |
| $R_m$ (Mortgage Constant) | = .0925 |

An Equity Dividend Rate of 10% is considered to be appropriate for this property based upon rate expectations for a property of this type.

**Capitalization Rate Calculation Using the Band of Investment Technique:**

| Loan & Equity | | Rm | | |
|---|---|---|---|---|
| M | X | Re | = | Weighted Rate |
| Mortgage .75 | X | .0925 | = | .0694 |
| Equity .25 | X | .10 | = | .025 |
| | | Ro | = | .094 |

**Capitalization Process and Value by the Income Capitalization Approach:**

$$V_o = \frac{NOI}{R_o} = \frac{\$23,655}{.094} = \$251,649$$

Say                  $250,000

VALUE BY THE INCOME CAPITALIZATION APPROACH           $250,000

*James H. Webster & Associates, Ltd.*                                             19

## SALES COMPARISON APPRAOCH

The Sales Comparison Approach, or Market Data Approach, is based on the principle of substitution, which states that a typical buyer or investor would pay no more for a property than what he or she could purchase a similar property for.  This approach is most effective in an active market.

Sales of properties that contain the same salient features as the subject property have been collected. The comparable sales have been analyzed and market extracted adjustments can be made for those significant differences that exist between the subject and the comparable.  The sales are adjusted for property rights conveyed, conditions in the market, terms of financing, unusual conditions of sale, physical characteristics, and location.  The adjusted price represents what the property would have sold for if it contained the same characteristics as the subject.

The data shown on the following pages represent the most comparable sales available in the market.

*James H. Webster & Associates, Ltd.*                                          20

**IMPROVED PROPERTY SALE #1**

| | |
|---|---|
| LOCATION | 525 East Springfield Road |
| | Arcola, Illinois |
| | |
| GRANTOR | State Bank of Arthur Trust 317 |
| GRANTEE | Restaurant Unlimited, Inc |
| DATE OF SALE | January 1995 |
| RECORDING | Book 342, Page 51 |
| SALE PRICE | $150,000 |
| BUILDING SIZE | 2,080 Square Feet |
| LOT SIZE | +/-35,000 Square Feet |
| LAND:BLDG RATIO | 16.82:1 |
| ZONING | B-2, Commercial |
| SALE PRICE/SF | $72.12 |

COMMENTS      This represents the sale of another Hen House restaurant facility which is the same prototype design as the subject property. It was also constructed in the same era and was in similar condition to the subject property. It is located at the Route 133 or Arcola exit on I-57.

*James H. Webster & Associates, Ltd.*                                    21

**IMPROVED PROPERTY SALE #2**

| | |
|---|---|
| LOCATION | 207 North Lombard |
| | Mahomet, Illinois |
| | |
| GRANTOR | Hardee's |
| GRANTEE | MMT Properties |
| DATE OF SALE | November 2001 |
| RECORDING | Document 2001R32066 |
| SALE PRICE | $350,000 |
| BUILDING SIZE | 4,325 SF |
| LOT SIZE | 38,507 SF |
| LAND:BLDG RATIO | 8.9 : 1 |
| ZONING | Commercial |
| SALE PRICE/SF | $80.92 |

COMMENTS      This restaurant facility was constructed in 1980. It is situated near the Route 47 interchange with Interstate 74. It was discontinued as a Hardee's, and it has been converted into an Arby's restaurant.

*James H. Webster & Associates, Ltd.* 22

**IMPROVED PROPERTY SALE #3**

| | |
|---|---|
| LOCATION | 102 Dettro Drive |
| | Mattoon, Illinois |
| | |
| GRANTOR | CK Restaurants |
| GRANTEE | Jerry Meyerscough |
| DATE OF SALE | June 2000 |
| RECORDING | Book 788, Page 285 |
| SALE PRICE | $660,000 * |
| BUILDING SIZE | 4,550 SF |
| LOT SIZE | 48,569 SF |
| LAND:BLDG RATIO | 10.67 : 1 |
| ZONING | Commercial |
| SALE PRICE/SF | $140.00 |

COMMENTS    This represents the sale of a former Country Kitchen restaurant, which is an outlot to the Kmart on Route 16, approximately one-half mile west of Interstate 57. It was approximately five years old at the time of sale. It has been converted into a Fazoli's restaurant. *According to the declaration, $27,000 was allocated to personal property. This results in a price of $633,000 for the improvements.

*James H. Webster & Associates, Ltd.*                                    23

**IMPROVED PROPERTY SALE #4**

| | |
|---|---|
| LOCATION | Route 36 |
| | Tuscola, Illinois |
| | |
| GRANTOR | Mark Kessler |
| GRANTEE | Jeffrey Carlton |
| DATE OF SALE | January 2001 |
| RECORDING | Book 593, Page 259 |
| SALE PRICE | $184,000 |
| BUILDING SIZE | 1,973 SF |
| LOT SIZE | 18,750 SF |
| LAND:BLDG RATIO | 9.5 : 1 |
| ZONING | B-1, Business |
| SALE PRICE/SF | $93.26 |

COMMENTS     This represents the sale of a frame building located on Route 36 near an Interstate 57 interchange. Two thirds of the building was occupied by a Subway restaurant with one third used as a private office space. It included a drive-through window. It previously sold in June 1997 for $168,000, representing an increase of 2.7% per year.

*James H. Webster & Associates, Ltd.*                                        24

**IMPROVED PROPERTY SALE #5**

| | |
|---|---|
| LOCATION | 810 South Sangamon |
| | Gibson City, Illinois |
| | |
| GRANTOR | Boyle |
| GRANTEE | Imer Ballazhi |
| DATE OF SALE | May 1998 |
| RECORDING | Document 208989 |
| SALE PRICE | $412,500 * |
| BUILDING SIZE | 4,250 SF |
| LOT SIZE | 41,325 SF |
| LAND:BLDG RATIO | 9.72 : 1 |
| ZONING | Commercial |
| SALE PRICE/SF | $75.88 |

COMMENTS    This is the sale of a sit down style family restaurant located on the south edge of Gibson City. The building was new in 1993 and exhibits good quality and appeal. The site was nearly one acre and includes an asphalt paved parking lot. *Document submitted to the assessor indicate a gross price of $412,500 with $90,000 allocated for equipment and fixtures. This results in a price of $322,500 for the improvements.

*James H. Webster & Associates, Ltd.*                                                                25

## IMPROVED PROPERTY SALE #6

| | |
|---|---|
| LOCATION | 2698 County Road 1600 North |
| | Ogden, Illinois |
| | |
| GRANTOR | Lynn Armstrong |
| GRANTEE | Pink Land LLC |
| DATE OF SALE | January 2003 |
| RECORDING | Document 2003R01853 |
| SALE PRICE | $240,000 |
| BUILDING SIZE | 3,496 SF |
| LOT SIZE | 32,670 SF |
| LAND:BLDG RATIO | 8.97 : 1 |
| ZONING | B-4 |
| SALE PRICE/SF | $68.65 |

COMMENTS    This represents the sale of the Pink House, a tavern / restaurant facility that is situated on the intersection of Routes 150 and 49 in Ogden. It was constructed in 1984 but added to and remodeled in 2001.

*James H. Webster & Associates, Ltd.*                                                    26

## SUMMARY OF IMPROVED SALES

| Sale | SP / SF | Date of Sale | Size (SF) | Age/Condition |
|------|---------|--------------|-----------|---------------|
| 1 | $72.12 | January 1995 | 2,080 | 30/Average |
| 2 | $80.92 | November 2001 | 4,325 | 25/Average |
| 3 | $140.00 | June 2000 | 4,550 | 5/Average |
| 4 | $93.26 | January 2001 | 1,973 | 30/Average |
| 5 | $75.88 | May 1998 | 4,250 | 5/Average |
| 6 | $68.65 | January 2003 | 3,496 | 20/Average |

## ADJUSTMENT GRID

| Sale | 1 | 2 | 3 | 4 | 5 | 6 |
|------|---|---|---|---|---|---|
| SP / SF | $72.12 | $80.92 | $140.00 | $93.26 | $75.88 | $68.65 |
| Date of Sale | Inferior +30% | Inferior +9% | Inferior +13% | Inferior +12% | Inferior +20% | Inferior +6% |
| Time Adj SP/SF | $93.76 | $88.20 | $158.20 | $104.45 | $91.06 | $72.77 |
| Location | Inferior +10% | Similar | Similar | Similar | Inferior +35% | Inferior +25% |
| Age/Condition | Similar | Similar | Superior -25% | Similar | Superior -25% | Superior -10% |
| Quality | Similar | Superior -10% | Superior -20% | Similar | Superior -10% | Similar |
| Land:Bldg | Similar | Inferior +20% | Inferior +10% | Inferior +10% | Inferior +10% | Inferior +15% |
| Net | +10% | +10% | -35% | +10% | +10% | +30% |
| Adj SP/SF | $103.13 | $97.02 | $102.83 | $114.90 | $100.16 | $94.60 |

The comparable sales shown above result in a range of sale prices per square foot varying between $72.12 and $140.00 prior to adjustment with the range narrowed to between $94.60 and $114.90 after adjustment. Areas of adjustment include date of sale which was made initially based upon 3% per year with the other areas of adjustment which include location, age/condition, quality and land to building ratio made on a cumulative basis. Sales #1, #2, #3 and #4 are accessible to an Interstate although Sale #1 is located in a commercial district which has lower land costs/values. Sale #5 and #6 are not located at Interstate exits and both were adjusted accordingly. Sales #3 and #5 are considerably newer facilities and both were adjusted downward by 25%. Sale #6 is slightly newer. Sales #1, #4 and #6 are considered to be similar in respect to quality. Sales #2 and #5 are slightly superior and Sale #3 has considerably higher quality. Sale #1 is similar in respect to land to building ratio. Sales #2-6 are inferior and all were adjusted accordingly. After making these adjustment a unit value of $110.00/square foot is considered to be reasonable. Therefore,

*James H. Webster & Associates, Ltd.* 27

2,080 Square Feet @ $110.00/SF   =   $228,800

Say  $230,000

VALUE BY THE SALES COMPARISON APPROACH  $230,000

*James H. Webster & Associates, Ltd.*                                        28

RECONCILIATION

| | |
|---|---|
| Cost Approach | $280,000 |
| Income Capitalization Approach | $250,000 |
| Sales Comparison Approach | $230,000 |

The three approaches result in a reasonable range of values.  All three approaches have been considered and each approach has been given nearly equal weight.  Therefore, it is my opinion that the Market Value of the subject property, as of January 10, 2005, was TWO HUNDRED FIFTY THOUSAND ($250,000) DOLLARS.  The opinion of value is subject to the site being free of contaminants.


James H. Webster, MAI, SRA                    January 20, 2005
                                              Date

F:\word\docs\ limited\04-19715

*James H. Webster & Associates, Ltd.*

## CERTIFICATION

I certify that, to the best of my knowledge and belief:

1.  the statements of fact contained in this report are true and correct.

2.  the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial and unbiased professional analyses, opinions and conclusions.

3.  I have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.

4.  I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5.  my engagement in this assignment was not contingent upon developing or reporting predetermined results.

6.  my compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the clause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7.  my analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

8.  I have made a personal inspection of the property that is the subject of this report.

9.  no one provided significant professional assistance to the person signing this report, except as stated in the scope of the appraisal.

10.  this appraisal has been developed and the report has been prepared in conformity with, and is subject to the requirements of, the Code of Ethics and Standards of Professional Practice and Conduct of the Appraisal Institute.

11.  as of the date of this report, I, James H. Webster, have completed the requirements of the continuing education program of the Appraisal Institute.

12.  The use of this report is subject to the requirements of the Appraisal Institute relating to review by its authorized representative.

*James H. Webster & Associates, Ltd.*

**RESTRICTION UPON DISCLOSURE AND USE**

Disclosure of the contents of this appraisal report is governed by the by-laws and regulations of the Appraisal Institute.

Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser or the firm with which he is connected, or any reference to the Appraisal Institute or the MAI designation) shall be disseminated to the public through advertising media, public relations media, news media, sales media, or any other public means of communication, without prior written consent and approval of the undersigned.

James H. Webster, MAI, SRA
Illinois State Certified General
Real Estate Appraiser #153.0000270
Expires 09/30/2005

*James H. Webster & Associates, Ltd.*

## LIMITING CONDITIONS

This appraisal is subject to the following limiting conditions:

1. The legal description furnished is assumed to be correct.

2. I assume no responsibility for matters in character, nor do I render any opinion as to title, which is assumed to be marketable. All existing liens and encumbrances have been disregarded, and the property is appraised as though fee and clear under responsible ownership and competent management.

3. Unless otherwise noted herein, it is assumed that there are no encroachments, zoning violations or restrictions existing in the subject property.

4. Information, estimates, and opinions contained in this report are obtained from sources considered reliable; however, no liability for them can be assumed by the appraiser.

5. Possession of this report, or a copy thereof, does not carry with it the right of publication, nor may it be used for any purpose by anyone but the applicant, without the previous written consent of the appraiser or the applicant, and in any event, only with the proper qualifications.

6. I am not required to give testimony or attendance in court by reason of this appraisal, with reference to the property in question, unless arrangements have been made previously.

7. Proposed improvements, if any, are to be completed in a good and workmanlike manner according to the plans and specifications submitted to your appraiser. The appraisal is subject to an inspection after completion in order to determine if those previously mentioned conditions have been met. If a Prospective Market Value estimate is provided in the report it is based on the Extraordinary Assumption that the planned improvements will be completed in a good and workmanlike manner by the effective date of the Prospective Value. The value estimate is based on market conditions prevailing as of the date of the report, and the appraiser cannot be held responsible for unforeseeable events that may alter market conditions prior to the effective date of the appraisal.

8. It is assumed that improvements contain no hazardous materials, such as urea-formaldehyde insulation, asbestos, or lead-based paint. Furthermore, it is assumed that there are no hidden soil or sub-soil conditions that have been determined to be hazardous, such as an underground gasoline storage tank, radon, or toxic or hazardous wastes.

9. The distribution of land and improvements is applicable only as a part of the whole property. The land or improvement values must not be used in conjunction with any other appraisal, and are invalid if so used.

*James H. Webster & Associates, Ltd.*

10.     I have made no compliance survey or analysis to determine if the property is in compliance with the American's with Disabilities Act (ADA). It is possible that a survey could reveal the property is not in compliance with ADA, which might have a negative effect on value.

11.     This appraisal is intended solely for use by the client and for the purpose stated in the report. Use of this report by any other purpose or for any other purpose is not permitted without prior authorization from James H. Webster & Associates, Ltd..

12.     This appraisal assignment was developed in a manner that excluded some of the specific requirements of Standards Rule 1-4 of the Uniform Standards of Professional Appraisal Practice, and it is therefore termed a Limited Appraisal. The specific requirements that were excluded under the Departure Rule have been identified in the body of the report.

13.     This is a Summary Report designed to comply with Standards Rule 2-2(b) of the Uniform Standards of Professional Appraisal Practice.

*James H. Webster & Associates, Ltd.*

## QUALIFICATIONS OF THE APPRAISER
### James H. Webster, MAI, SRA

Education

| | |
|---|---|
| 1973 | Ohio State University, B.S. in Real Estate and Urban Economics |
| 1973 | SREA 101, Introduction to Real Estate Appraising |
| 1973 | SREA 201, Principles of Income Property Appraising |
| 1974 | AIREA 202, Urban Properties |
| 1999 | Appraisal Institute, USPAP, Part C |
| 1999 | Appraisal Institute 600, Income Valuation of Small, Mixed-Use Properties |
| 1973-2004 | Attended Various Seminars Sponsored by the Appraisal Institute |

Experience

| | |
|---|---|
| 1973-1975 | Commerce Investment Corporation, Staff Appraiser |
| 1975-1983 | First Federal Savings, Appraiser and Loan Officer |
| 1983-1986 | American Savings, Staff Appraiser |
| 1986-present | James H. Webster & Associates, Ltd., President |

| Review Appraiser | Certification |
|---|---|
| HUD | Illinois State Certified General Real Estate Appraiser |
| FNMA | #153.0000270 |
| Institutions | Expires 09/30/2005 |

Expert Witness
Douglas, Piatt, Macon, Crawford and Champaign counties

Teaching

Parkland College, Champaign, Illinois

| | |
|---|---|
| 1997 | Principles of Real Estate Appraisal |
| 2000 | Uniform Standards of Professional Appraisal Practice |

Professional Service

| | |
|---|---|
| 1976-1979 | SREA, Treasurer, Chapter #166 |
| 1979 | SREA, Young Advisory Committee |
| 1980-1981 | SREA, Vice President, Chapter #166 |
| 1982-1983 | SREA, President, Chapter #166 |
| 1989-1990 | SREA, Vice President, Chapter #166 |
| 1991 | Appraisal Institute, President, Central Illinois Chapter |

Professional Designations

| | |
|---|---|
| 1981-present | SRA, Senior Residential Appraiser |
| 1986-present | Realtor, Champaign County Association of Realtors |
| 1990-1994 | SRPA, Senior Real Property Appraiser |
| 1994-present | MAI, Member of the Appraisal Institute |

*James H. Webster & Associates, Ltd.*

## LIST OF CLIENTS

### BANKS/SAVINGS & LOANS

American National Bank & Trust
American Savings Bank – Danville
Bank of America
Bank of Illinois in Normal
Bank One
BankChampaign
BankIllinois
Busey Bank
Central Illinois Bank
Citibank
Citizen's National Bank – Paris
Effingham State Bank
First Bank & Trust – Paris
First Federal of Champaign-Urbana
First Federal Savings – Bloomington
First Mid-Illinois Bank
First Midwest Bank
First National Bank – Danville
First National Bank – Ogden
First State Bank - Monticello
First State Bank – Tuscola
Harris Trust & Savings – Chicago
Heartland Bank & Trust
J.P. Morgan
Kankakee Federal
LaSalle National Bank
Longview State Bank
National City Bank
North Shore Bank
Tuscola National Bank
Union Planters
Villa Grove State Bank
Wells Fargo

### GOVERNMENTAL AGENCIES

Champaign County
Champaign County Board of Review
Champaign Park District
Champaign-Urbana Mass Transit
City of Champaign
City of Champaign Township
City of Mattoon
City of Monticello
City of Urbana
Coles County Assessor
Cunningham Township Assessor
Housing Authority of Champaign County
Mental Health Center of Champaign County
Piatt County Board
United States Postal Service
Urbana Park District

### INSTITUTIONAL CLIENTS

University of Illinois
University of Illinois Foundation

### INVESTMENT/INSURANCE

DLJ Real Estate Investment Partners
GE Capital
GMAC Commercial
JP Melody
Indiana Insurance
Merrill Lynch
State Farm Insurance

*James H. Webster & Associates, Ltd.*



FRONT VIEW OF SUBJECT



REAR VIEW OF SUBJECT

*James H. Webster & Associates, Ltd.*



DINING



KITCHEN

*James H. Webster & Associates, Ltd.*



LOOKING EAST



LOOKING WEST

# THOMPSON COBURN

E-FILED
Monday, 21 August, 2006  11:39:28 AM
Clerk, U.S. District Court, ILCD

*Thompson Coburn LLP*
*Attorneys at Law*

One US Bank Plaza
St. Louis, Missouri 63101
314-552-6000
FAX 314-552-7000
www.thompsoncoburn.com

April 19, 2005

Steven D. Graham
314-552-6041
FAX 314-552-7041
EMAIL sgraham@
thompsoncoburn.com

**VIA E-MAIL AND FIRST CLASS MAIL**

Jeffery B. Wampler, Esq.
Erwin, Martinkus & Cole, Ltd.
411 W. University Ave.
Champaign, IL 61820

Re:    **Lease dated on or about March 18, 1975 and effective as of July 18, 1975 (as amended, the "Lease") by and between Robert C. Taylor and Jacqueline N. Taylor as "Lessor" and Hen House Interstate, Inc. as "Lessee" and pertaining to that certain property described therein as the "Demised Premises" located in the County of Champaign and the Village of Mahomet, Illinois, commonly known as the "Hen House Restaurant"**

Dear Mr. Wampler:

As you know, this firm represents Restaurants Unlimited, Inc. ("Tenant"), successor in interest to the above-referenced original Lessee under the Lease. On behalf of Tenant, we acknowledge receipt of your e-mail from last Friday afternoon on behalf of the Taylor family and declaring its opinion that the fair market value of the Demised Property is $425,000. Per my response e-mail, I discussed this matter with Mr. Rugg. As expected, the $175,000 gap in the parties' position essentially eliminates any reasonable prospect that the parties will be able to voluntarily reach an agreement as to value and avoid the appraisal process.

I enclosed along with my March 17, 2005 letter a copy of the appraisal prepared by James H. Webster, MAI, SRA for Lessor's reference. Pursuant to Section 25 of the Lease, this letter is to formally acknowledge and notify Lessor that Tenant has selected Mr. Webster as its appraiser for these purposes.

Please advise as to the identity and credentials of the appraiser selected by Lessor at your earliest convenience. We would also appreciate receiving any supporting documentation or analysis upon which Lessor's opinion as to fair market value was based for Tenant's review and consideration. Even if the parties are unable to reach a voluntary and mutually acceptable

3113604

**EXHIBIT**

D

April 19, 2005
Page 2

agreement as to fair market amount, this information will be necessary to facilitate the appraisal procedures referenced in the Lease on a timely basis.

Please contact me at your earliest convenience to discuss these maters.  We look forward to hearing from you soon.

Very truly yours,

Thompson Coburn LLP

By

Steven D. Graham

SDG/cr

cc: Mr. Larry Rugg

3113604

# LIMITED SUMMARY APPRAISAL REPORT

## OF

### 700 E. EASTWOOD DRIVE
### MAHOMET, IL  61853

PREPARED FOR:

MR. RUSS TAYLOR
101 SOUTH LINCOLN
MAHOMET, IL  61853

DATE OF VALUATION:  MAY 27, 2005

DATE OF INSPECTION:  MAY 27, 2005

DATE OF REPORT:        JUNE 6, 2005

PREPARED BY:

J. LLOYD BROWN
BROWN & BROWN REAL ESTATE APPRAISALS
118 S. RACE ST., P.O. BOX 488
URBANA, IL  61803-0488
(217) 367-4011

**Brown & Brown Real Estate Appraisals**
118 S. RACE STREET • P.O. BOX 488
URBANA, ILLINOIS 61801

EXHIBIT

E

PENGAD 800-631-6989

June 6, 2005


Mr. Russ Taylor
101 South Lincoln
Mahomet, IL 61853

      Re:    Limited Summary Appraisal of the property located at:
            700 E. Eastwood Drive, Mahomet, IL 61853

Dear Mr. Taylor,

      Pursuant to your request I hereby certify that I have personally inspected the property known as 700 E. Eastwood Drive, Mahomet, Illinois. The legal description of said property is within this report. The purpose of this appraisal report is to estimate the Market Value of the leased fee and fee simple interests in the subject property as of May 27, 2005. The function of the appraisal report is to assist in valuating for ownership knowledge.

      Based on my inspection of the property, I believe I possess the experience, educational background, and expertise regarding this appraisal assignment to satisfy the Competency Provision of USPAP. The limited summary appraisal report is prepared in accordance with the appraisal guidelines established by Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). This transmittal letter is followed by the certification of the appraisal the report containing the reasoning and pertinent data leading to the estimated value.

      All factors considered, it is my opinion that the "as is" Market Value of the leased fee and fee simple interest in the subject property as of May 27, 2005, subject to the assumptions and limiting conditions stated within, are:

      **Fee Simple "as is" Market Value**                **$ 365,000.00**


Respectfully submitted,

BROWN & BROWN REAL ESTATE APPRAISALS

*J. Lloyd Brown*

J. Lloyd Brown
Illinois State Certified General
Real Estate Appraiser, Lic. #153.0000442

# TABLE OF CONTENTS

Summary of Salient Facts and Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . Page  4

Assumptions & Limiting Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page  5

Identification of the Subject Property. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page  6

Scope of the Appraisal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page  8

Definitions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page  10

Community Data. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page  12

Site Description. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page  16

Building Description. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page  19

Highest and Best Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page  24

The Appraisal Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page  25

Bare Land Value Estimate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page  26

Cost Approach. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page  31

Income Capitalization Approach. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page  36

Sales Comparison Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page  42

Reconciliation and Valuation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page  52

Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page  54

Qualifications. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page  55

## SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

| | |
|---|---|
| PROPERTY | Commercial Restaurant Building |
| Street | 700 E. Eastwood Drive |
| City | Mahomet |
| County | Champaign |
| State | Illinois |
| TAX MAP NUMBER | 15-13-15-251-022 & 032 |
| OWNER OF RECORD | Jacqueline Taylor, Trustee |
| DATE OF APPRAISAL/VALUATON | May 27, 2005 – "as is" |
| | May 27, 2005 – Date of Inspection |
| LAND AREA | 163.3' x 68.17' x  169.01' x 101.06' x 102.36' x 249.72' = 43,570.77 sq. ft. |
| ZONING | Commercial |
| FLOOD ZONE – PANEL # - DATE | Zone C, 170029A, November 23, 1973 |
| Property Type | 1 Story Retail/Restaurant Building |
| Size | 2,136/Sq. Ft. Gross Bldg. Area |
| Construction | Class "D", Average |
| HIGHEST AND BEST USE – VACANT | Commercial Retail/Restaurant |
| HIGHEST AND BEST USE – IMPROVED | Commercial Retail/Restaurant |
| LAND VALUATION | $  275,000.00 |
| COST APPROACH (Leased Fee) | $  405,000.00 |
| INCOME APPROACH (Leased Fee) | $  366,000.00 |
| SALE COMPARISON APPROACH (Leased Fee) | $  358,000.00 |
| RECONCILED VALUE CONCLUSION | $  365,000.00 |
| REASONABLE EXPOSURE TIME | 120-180 days |

## ASSUMPTIONS AND LIMITING CONDITIONS

1.  The legal description furnished is assumed to be correct and no responsibility is assumed for matters legal in character nor is any opinion rendered as to title which is assumed to be marketable.

2.  The maps, plats, and exhibits included in this report are for illustration only to help the reader visualize the property. They should not be considered as surveys or relied upon for any other purpose. No appraiser responsibility is assumed in connection therewith.

3.  This appraiser, by reason of this report, is not required to give testimony or be in attendance in any court or before any governmental body with reference to the property in question unless arrangements have been previously made.

4.  No engineering survey has been furnished to the appraiser, and no responsibility is assumed for engineering matters, mechanical or structural. Good mechanical and structural condition is assumed to exist.

5.  Unless otherwise stated in this report, the existence of hazardous substances, including without limitation asbestos, polychlorinated biphenyl's, petroleum leakage, or agricultural chemicals, which may or may not be present on the property, or other environmental conditions, were not called to the attention of nor did the appraiser become aware of such during the inspection. The appraiser has no knowledge of the existence of such materials on or in the property unless otherwise stated. The appraiser, however, is not qualified to test such substances or conditions. If the presence of such substances, such as asbestos, urea formaldehyde foam insulation, radon gas, or other hazardous substances or environmental conditions, may affect the value of the property, the value estimate is predicated on the assumptions that there is no such condition on or in the property or in such proximity thereto that is would cause a loss in value. No responsibility is assumed for any such conditions or any expertise of engineering knowledge required to discover them.

6.  No soil survey has been furnished, and it is assumed that no surface or subsurface contaminants, pollutants, or discharge is present. The appraiser reserves the right to alter, amend, revise, or rescind any of the value opinions based upon any subsequent environmental impact studies, research, or investigation.

7.  It is assumed that there is full compliance with all applicable federal, state, and local environmental regulations and laws, unless noncompliance is state and considered in this report.

8.  No soil borings or analysis has been made of the subject. It is assumed that the soil conditions are adequate to support standard construction consistent with the highest and best use as stated in this report

9.  It is assumed that all required licenses, consents, or other legislative or administrative authority from an local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based, unless noncompliance is stated and considered in this report.

10. The individual values estimated for the various components of the subject property are valid only when taken in the context of this report and are invalid if considered individually or as components in connection with any other appraisal.

11. Financial projection and/or estimates are based on information and assumptions outlines in this report. The actual achievement of financial projections may be affected by fluctuating economic conditions and other factors not generally predictable in advance. Therefore, actual results achieved may vary substantially form the projection. The analysis is not intended as an accurate future forecast, rather it is offered as an example of the type of analysis that an arms length purchaser of the subject property would consider.

12. The date of value to which the opinions expressed in this report is set forth in a letter of transmittal. The appraiser assumes no responsibility for subsequent economic or physical factors, which may affect the opinions herein stated.

**Brown & Brown Real Estate Appraisals**

118 S. RACE STREET • P.O. BOX 488

URBANA, ILLINOIS 61801

## INDENTIFICATION OF THE PROPERTY

The property being appraised is located at the north edge of the town of Mahomet, Illinois. More specifically in the southeast quadrant of the intersection of Interstate 74 and State Route 47 (known as Lombard Street). East Eastwood Drive is just south of the entrance ramp to Interstate 74. The subject is located at the northeast corner of Lombard and Eastwood. There is no direct access to the subject from Lombard Street.

Eastwood Drive is a commercial subdivision with various commercial locations south and east of the subject. These include a grocery supermarket, motel, service station, and various other commercial retail type businesses. In addition, both sides of Lombard Street are developed possibly 70% commercially. This extends for some one half mile south to the intersection of State Route 47 and U.S. Route 150. The subject location is considered prime due to its visibility and access to Interstate 74 and the Eastwood Drive shopping area.

## LEGAL DESCRIPTION

The legal description of the subject land parcel is as follows:

That part of the N ½ of Section 15, Township 20 North, Range 7 East of the 3rd Principal Meridian described as follows:

Commencing 34 rods 8 link (566.28 feet) South of the Northeast Corner of the Northwest Quarter of the Southwest Quarter of the Northeast Quarter of Section 15, Township 20 North, Range 7 East of the Third Principal; thence running 212.50 feet West; thence North 137.28 feet; thence West 48.50 feet; thence North 192.83 feet; thence South 89 ° 53' 15" West 400 feet to an iron pipe monument, the Northeast Corner of Sunoco Service Station property as shown on a plat of survey dated July 19, 1967, done by John Delbert Goodell, Registered Illinois Land Surveyor No. 1462 for Mr. R. C. Taylor; thence North 69° 31' 10" West to the Northwest Corner of said Sunoco Service Station Property also being on the East Right-Of-Way Line of State Route 47 (S.B.I. Route 10); thence North 26° 52' 50" East 60.38 feet on said East Right-Of-Way, to the point of beginning; thence continuing North 26° 52' 50" East 169.01 feet, on said East Right-Of-Way Line; thence North 28° 49' 50" East 101.06 feet, on said Right-Of-Way Line to a point on the Southeasterly Right-Of-Way Line of the Access Ramp of Interstate 74; thence South 82° 38' 51" East 102.36 feet, on said Southeasterly Right-Of-Way Line of the Access Ramp of Interstate 74; thence South 0° 06' 45" West 249.71 feet, to the North Line of an Access Easement; thence South 89° 53' 15" West 163.30 feet, on said North Line; thence North 69° 31' 10" West 68.17 feet, on said North Line to the Point of Beginning, containing 1.000 Acres and situated in Champaign County, Illinois.

## EFFECTIVE DATE OF LIMITED APPRAISAL

The date of this limited appraisal is May 27, 2005, the date of the last inspection. General assumptions and limiting conditions applicable to this limited appraisal report are attached to this report.

## PURPOSE AND FUNCTION OF THE APPRAISAL

The Purpose of the analysis in this report is to appraise the owner's leased interest and fee simple interest in the subject property. The function of the appraisal is to assist the client in evaluating the subject property for a possible sale. This limited appraisal report is prepared as of May 27, 2005, the date of the last inspection. This appraisal is not based on a requested minimum valuation, a specific value or the approval of a mortgage loan. This appraiser assumes that there are no outstanding code violations against the subject property.

## SCOPE OF THE APPRAISAL

This valuation is a Limited Appraisal presented in a Summary Report. The scope of the appraisal report requires compliance with the Uniform Standards of Professional Appraisal Practice. The standards contain binding requirements and specific guidelines that deal with the procedures to be followed in developing an appraisal, analysis, or opinion. These uniform standards set the requirements to communicate the appraisers' analyses, opinions, and conclusions in a manner that will be meaningful and not misleading in the marketplace.

Demographic and economic data has been collected from a wide variety of sources to assist in this report. The physical characteristics of the subject property have been acquired by a personal inspection. Market data, including land and improved property sales, building costs, rental rates, operation expenses, and supply and demand forces in the area are collected, presented and analyzed. This date is used to determine the Highest and Best Use of the subject property. The sources of data include internal files, MLS, Courthouse records, property managers and professional publications.

The data collected, confirmed and analyzed has been assembled in three different approaches to value. The reconciliation is the final step in the valuation process, at which time the relevancy and reliability of the three approaches are considered in determining a final value estimate.

It is important to note that the Limited Appraisal process did <u>not</u> include the following:

* Detailed review of the Zoning Ordinance which governs uses of the subject.
* In depth Highest and Best Use Analysis.
* Review of environmental or other survey reports.

<u>Departure From Specific Appraisal Guidelines</u> – Departure from specific guidelines of the USPAP include:

* In the performance of this limited appraisal, a complete market analysis was not made. The scope of the investigation was limited due to difficulty in obtaining sufficient information.

It is this appraisers determination that the development of this limited appraisal is not so confined as to result in a misleading or confusing report. The client has been advised of these departures and agrees the performance of a limited appraisal service is appropriate.

## OWNERSHIP HISTORY

The subject property is currently owned in the name of Jacqueline Taylor, Trustee. The property has not exchanged ownership within the past three year period.

## MARKETING PERIOD AND REASONABLE EXPOSURE

<u>Marketing Period</u>

The reasonable marketing time for a property is the most probable amount of time necessary to expose and actively market a property and achieve a sale price consistent with the final value estimate and on terms that are consistent with the definition of market value.

The Marketing Period begins as of the date of appraisal and the estimated time frame is based on the assumption that an appropriate and competent marketing program will be implemented by a professional brokerage/marketing agent. Qualified marketing personnel and aggressive marketing techniques should be employed. Lack of attention to this critical aspect may yield less than favorable results. The subject property is located in a desirable section of the community. A reasonable marketing period for the subject property, if marketed to the appropriate investment community and priced consistent with my value estimate would be 120 to 180 days.

<u>Reasonable Exposure</u>

Exposure time is similar to Marketing Period except that it is assumed to have occurred prior to the appraiser's Market Value estimate. A reasonable exposure time for the subject property, if marketed to the appropriate investment community and priced consistent with our value estimate would be less than one year.

# DEFINITIONS

## MARKET VALUE

<u>Definition of Market Value:</u>

According to the Appraisal Regulations of Federal Banking Agencies, "Market Value" means the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specific date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;

2. Both parties are well informed or well advised, and acting in what they consider their best interests;

3. A reasonable time is allowed for exposure in the open market;

4. Payment is made in terms of cash in U.S. Dollars or in terms of financial arrangements comparable thereto; and

5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Source:  Office of the Comptroller of the Currency under 12 CFR, Part 34, Subpart C – Appraisals, 34.42
            Definitions (f).

## FEE SIMPLE ESTATE OR INTEREST

<u>Definition of Fee Simple Estate or Interest:</u>

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminant domain, police power, and escheat.

**Brown & Brown Real Estate Appraisals**
118 S. RACE STREET • P.O. BOX 488
URBANA, ILLINOIS 61801

10

## LEASED FEE ESTATE

Definition of Leased Fee Estate:

An ownership interest held by a landlord with the rights of use and occupancy conveyed by lease to others. The rights of the lessor (the leased fee owner) and the leased fee are specified by contract terms contained within the lease.

## LEASEHOLD INTEREST OR POSITION

Definition of Leasehold Interest or Position:

The most important obligation associated with the rights to the use and occupancy of a leasehold interest is the payment of rent. Contract rent is the actual rental income specified in a lease. Rent is commonly paid by the tenant to the lessor according to a specified schedule. A leasehold interest usually has value when contract rent is less than market rent. Market rent is the rental income that a property would most probably command in the open market. Most negotiated leases reflect contract rent equal to market rent.

When market rent exceeds contract rent, the leasehold interest may have value, assuming that the lease term is long enough to be marketable and the lease allows for subletting or assignment. When contract rent exceeds market level, the leasehold may have a negative value.

## LEASEHOLD ESTATE

Definition of Leasehold Estate:

The interest held by the lessee (the tenant or renter) through a lease conveying the rights of use and occupancy for a stated term under certain conditions.

## COMMUNITY DATA – SUMMARY

The subject property is located in Mahomet, Illinois, which is to the west part of Champaign County, Illinois. This is a location in East Central Illinois portion of the state. Mahomet is located ten miles northwest of Champaign-Urbana, Illinois. Champaign-Urbana is the largest principal city in this area of the state. Mahomet is located 135 miles south of Chicago, 165 miles northeast of St. Louis, 130 miles west of Indianapolis, and 85 miles southeast of Peoria, Illinois.

The Community offers good access to the local highway transportation system. Interstate 74 runs east-west along the north side of the town. U.S. Route 150 is also an east-west highway through the center of the community. State Route 47 is a north-south roadway which severs the town. There are two airports located in the Champaign-Urbana area. The primary being the University of Illinois Willard Airport, located just south of Champaign in Savoy, Illinois. A new terminal was constructed for this facility in 1989. Passenger service is provided by American Eagle to Chicago O'Hare and St. Louis Lambert. In addition, Northwest Airlink flies to Detroit and Delta Connection to Cincinnati, Ohio. From these points access to worldwide locations is available. Willard Airport provided service to approximately 150,000 passengers in 2003. Frasca Field, located at the north edge of Urbana is a smaller private plane facility. This has a paved 4,000 linear foot runway with hangar facilities and navigation aids.

Champaign County has a population of approximately 180,000 based on the 2000 Census. Champaign-Urbana-Savoy area has a population of approximately 110,000. Champaign County has 70,597 households (2000), a median household income of $37,780.00 (1999) and a Per capita income of $19,708.00 (1999). Mahomet is a community of approximately 5,000, however, considerable development beyond the Town Limits has occurred over the past 20 years. The majority of this development is residential. Mahomet is considered a bedroom community to the Champaign-Urbana location.

The University of Illinois, with a student enrollment exceeding 38,500 in 2003, is the dominant employer in the area. Carle Clinic and Carle Foundation Hospital have a combined work force of over 4,500. Other major Champaign-Urbana employers include Kraft Foods and Provina/Covenant medical center. The industrial sector includes manufactures and distributors predominately in the plastic, heavy machinery, computer components, and food products. The area historically has a nominal rate of unemployment, below the national average and found in the range of 3-4%.

The utilities are typical to any well-organized city. Electricity, water and natural gas are made available to the area. Telephone, sanitary, and solid waste facilities are adequate and ample for present usage. To the northeast of the town is the Champaign Forest Preserve, Lake of the Woods. This is a sizable recreational area providing many amenities including an 18 golf course and 9 hole par three. This facility is well kept and is accessible to all of East Central Illinois.

The community of Mahomet is strategically located and has a good transportation network, and have enjoyed stable economic growth over the past thirty-five years. Notable growth has been evident in residential development.

**Regional Map**



**Brown & Brown Real Estate Appraisals**

## City/Area Map



**Brown & Brown Real Estate Appraisals**
118 S. RACE STREET • P.O. BOX 488
URBANA, ILLINOIS 61801

14



**Neighborhood Map**

Subject

## SUBJECT SITE DESCRIPTION:

| | |
|---|---|
| Location: | 700 E. Eastwood Drive<br>Mahomet, IL 61853 |
| Land Area: | Approximately 1 Acre<br>163.3' x 68.17' x 169.01 x 101.06' x 102.36' x 249.72' =<br>43,570.77 sq. ft. |
| Shape/Frontage: | Irregular shape with frontage facing south on Eastwood Drive<br>extending 231.47'. In addition, there is frontage facing west on<br>Lombard of 270.07' without access. |
| Zoning: | Commercial |
| Parking: | Surfaced asphalt parking is located to the west, south and east of<br>the building structure. Total parking area is estimated to cover<br>25,000 sq. ft. |
| Topography: | The site slopes gently from the north to the south with the street<br>frontage being slightly above the street grade. |
| Improvements: | One story frame restaurant facility on a crawl space concrete block<br>foundation. The building has a second floor loft storage area.<br>Constructed in 1975, this was a "stock plan" used for Hen House<br>Franchise Restaurants. The structure consists of 2,136 sq. ft. of<br>ground area. The loft area is accesible by an outside stairway to<br>the north |
| Utilities: | All public utilities are available to the subject property. These<br>include gas, electric water, telephone and sewer. |
| Flood Hazard: | The subject property is located in a Flood Zone C. This is an area<br>located outside of the 500-year flood zone (Community Panel<br>170029A, dated November 23, 1973). |
| Ingress/Egress: | The subject site has access off Eastwood Drive. |
| 2004 Taxes: | $7,387.66 |
| 2204 Assessed Valuation: | $91,850.00 |

**Brown & Brown Real Estate Appraisals**
118 S. RACE STREET • P.O. BOX 488
URBANA, ILLINOIS 61801

16

## BUILDING DESCRIPTION – SUMMARY

| | |
|---|---|
| Age: | 700 E. Eastwood Drive, Built 1975 |
| Building Size: | 1st Floor – 2,136 sq. ft.<br>2nd Floor (Storage-Nominal Space) |
| Foundation: | Concrete Block – Crawl Space |
| Building Exterior: | Wood Frame on block foundation. |
| Doors: | Access doorways front and rear of building. Front entry air lock. |
| Roof: | Plastic tile sloped roof covering to metal gutters and downspouts. |
| Windows: | Set glass in wood frames to the west and south. |
| Interior Finish: | The interior has panel walls and ceilings. Carpet, resilient and tile floors. Lighting is predominately fluorescent ceiling hung fixtures. The interior area is made up of a kitchen, small office, gift shop and a main dining room space for approximately 60 customers. There are two restrooms facilities each having three fixtures. |
| HVAC: | The building has forced air gas fired heating units. Each unit also supplies central air conditioning through the same ductwork. Condensing units are located outside. |
| Electrical: | The building is supplied with two 200 AMP main electrical circuit breaker boxes. The service appears adequate for this size of structure. |
| Sprinklers: | None Noted. |
| Restrooms: | There are two 3 fixture facilities. Both located on the first level. Each has a sink and resilient tile floor covering. |
| Condition: | Inspection of the building found the structure to be in average condition. The property shows signs of wear at this time. |

PLAT OF SURVEY OF
THE NORTH ONE-HALF
SEC. 15, T.20N., R.7E., 3RD P.M.
VILLAGE OF MAHOMET
CHAMPAIGN COUNTY, ILLINOIS

HEN HOUSE
SURVEY



**Building Sketch**



**PHOTOGRAPHS**



FRONT OF 700 E. EASTWOOD DRIVE, MAHOMET, ILLINOIS

REAR OF 700 E. EASTWOOD DRIVE, MAHOMET, ILLINOIS



**PHOTOGRAPHS**



PARKING LOT – WEST OF BUILDING


REAR LAND PARCEL – TO NORTH



**PHOTOGRAPHS**



STREET SCENE – EASTWOOD DRIVE

STREET SCENE – LOMBARD STREET (STATE ROUTE 47)



## HIGHEST AND BEST USE

Real Estate is valued in terms of its Highest and Best Use. Highest and Best Use is the use that supports the highest present value of the improved property or vacant land as of the date of appraisal. The Highest and Best Use of a property estimated by the appraiser gives consideration to all possible uses of the real estate tested against the following examination criteria:

1.  <u>Physically Possible:</u>   A site's utilization is restricted by its physical characteristics. These characteristics include, but are not limited to: size, shape, soils composition, terrain and accessibility to public utilities.

2.  <u>Legally Permissible:</u>   The uses of a site are also restricted by various building codes, environmental regulations, deed or ground lease restriction, etc.

3.  <u>Financially Feasible:</u>   Assuming a use satisfies the above conditions, it is then tested for economic viability. That is, can the proposed use provide a reasonable financial return to warrant its development?

4.  <u>Maximally Productive:</u>    This last criteria is satisfied when it is shown that the proposed use is shown to be economically superior to otherwise feasible alternatives, in effect enabling the developer of a property conforming to such use to pay the highest possible price for the underlying land.

The Principal of Highest and Best Use determination is a function of neighborhood land use trends, property size, shape, zoning, and other physical factors, as well as the market environment in which the property must compete. Investors continually attempt to maximize profits on invested capital. The observation of investor activities in the area is an indication of that use which can be expected to produce the greatest net return to the land.

The principle of conformity holds, in part, that conformity in use is usually a highly desirable adjunct of real property, since it creates and/or maintains maximum value, and it is maximum value which affords the owner maximum returns.

The highest and best us of an improved property is normally analyzed under two scenarios: (1) as if vacant, and (2) as if improved.

I have assumed the Highest and Best Use of the subject property in this limited appraisal as of the date of valuation to be multiple family residential. As vacant, the highest and best use calls for a similar multiple family residential use. This is based on consideration given to all of the above factors.

## THE APPRAISAL PROCESS

The Appraisal Process is the orderly program designed to solve the problem that is defined. The work necessary to solve the problem is planned and the data involved is acquired, classified, analyzed, and interpreted into an estimate of value. The problem or objective of this complete appraisal is to estimate Market Value. The three generally accepted approaches which will be utilized in this appraisal are the Cost Approach, the Income Capitalization Approach and the Sales Comparison Approach (also known as the Market Data Approach).

In order to develop an estimate of market value for the subject property, the following techniques have been considered:

- The Cost Approach is based on the current cost of replacing a property less depreciation from all sources including physical deterioration, functional obsolescence, and external obsolescence. A summation of the market value of land, assumed vacant, and the depreciated replacement cost of the improvements provides an indication of the total value of the property.

- The Income Approach is based on either an analysis of a property's stabilized net operating income (Direct Capitalization) or a property's projected cash flow over a specified investment holding period. (Discounted Cash Flow or DCF analysis). In both methods, the net operating income estimate or projection is converted into value. Direct Capitalization is most appropriate for stabilized income situations or when income expected to change at a steady rate. DCF analysis is most suitable to variable or uneven income streams such as in multi-tenant leased properties or properties requiring absorption analysis. This approach measures the present worth of anticipated future benefits (cash flow).

- The Sale Comparison Approach (Market) derives and estimates value by comparing the subject property to sales of similar properties in the same or competing areas. This approach is used to indicate the value from transactions between informed buyers and sellers in the market.

A final step in the Appraisal Process is the Reconciliation or Correlation of the value indicators. In the Reconciliation, the appraiser considers the relative applicability of each of the three approaches utilized, examines the range between the value indicators and places emphasis on the one, or those, which appear to produce the most reliable and applicable solution to the appraisal problem. The adequacy and reliability of the data is analyzed and these considerations influence the weight given to each approach.

The Direct Sale Comparison Approach and the Income Approach are the most relevant approaches when valuing in this limited appraisal report.

## LAND VALUE ESTIMATE

The valuation estimate for the Subject land tract is based upon the analysis of similar land transactions found in the market in which the Subject Property must compete. These sales are found by a search of Deed Records or by conversations with Brokers or other real estate professionals. There are six recognized procedures used to determine land value which includes sales comparison, allocation, extraction, subdivision development, land and ground rent capitalization. All six techniques utilize the three basic approaches to value. The Sale Comparison Approach is the most often used technique and is preferred if sales data is available.

Major dissimilarities between the sales and the sale price are generally as follows:

TIME – The sales are analyzed to determine the amount of appreciation or decline in land values as time has progressed. Older sales are adjusted accordingly to reflect value levels.

LOCATION – The sales are compared to the Subject Property to isolate any locational differences. If a sale is considered to be superior in location when compared to the Subject Property, a downward adjustment is made to the sale. The opposite occurs when the sale is considered to be in an inferior location – upward adjustment.

UTILITY – The comparative differences here generally involve size, shape, utilities, flood plane areas, topography, road frontage or other items that affect the use of the sales and the Subject Property.

Our policy is to include all similar sales, but to adjust only the most comparable sales. The rationale being that the most comparable sales require the fewest adjustments and result in more reliable value estimates. We feel the reader should have the benefit of knowing the general market.

The market sales are on the following pages. The sales are adjusted on a dollar per square foot basis.

**LAND SALE #1**

| | |
|---|---|
| Location: | 701-703 Eastwood Drive<br>Mahomet, Illinois |
| Grantor: | Russell Taylor |
| Grantee: | KES Properties, L.L.C. |
| Size: | 43,200 sq. ft. |
| Zoning: | C-2 – Commercial |
| Sale Date: | August 2004 |
| Sale Price: | $ 229,000.00 or $5.30 per sq. ft. |
| Doc. No.: | 2004R23340, Champaign County Recorder's Office. |
| Utilities: | Available |
| Analysis: | This parcel is located east of Illinois Route 47 and south of Interstate 74. It has been improved with a new strip center.  Interior lot. |

**LAND SALE #2**

| | |
|---|---|
| Location: | U.S. Route 150 and Praireview Road<br>Mahomet, Illinois |
| Grantor: | Jo-Nell's Commons |
| Grantee: | McDonald's Corporation |
| Size: | 58,893 sq. ft. |
| Zoning: | C2 - Commercial |
| Sale Date: | July 2000 |
| Sale Price: | $ 257,362.00 or $4.37 per sq. ft. |
| Analysis: | This represents the sale of Lot9 in Jo-Nell's Subdivision, which is situated on the northwest corner of U.S. Route 150 and Prairieview Road, south of the interchange with Interstate 74.  It has been improved with a McDonald's restaurant. |

**Brown & Brown Real Estate Appraisals**

**LAND SALE #3**

| | |
|---|---|
| Location: | U.S. Route 150, west of Prairieview road<br>Mahomet, Illinois |
| Grantor: | Conway Farms |
| Grantee: | Larry Bielfeldt |
| Size: | 200' x 250' = 50,000 sq. ft. |
| Zoning: | Commercial |
| Sale Date: | January 2005 |
| Sale Price: | $ 200,000.00 or $4.00 per sq. ft. |
| Doc. No.: | 2005R03064, Champaign County Recorder's Office. |
| Analysis: | Vacant lot 437 of Conway Farms, facing north on U.S. Route 150, about ½ mile west of Prairieview Road. Commercial building presently under construction. Appraiser has made no adjustment for differing zoning. |

**LAND SALE #4**

| | |
|---|---|
| Location: | 706 E. Franklin Street<br>Mahomet, Illinois |
| Grantor: | Ida Babb Estate |
| Grantee: | Select Auto Sales |
| Size: | 66' x 165' = 10,890 sq. ft. |
| Zoning: | Commercial |
| Sale Date: | December 2002 |
| Sale Price: | $ 30,000.00 or $2.75 per sq. ft. |
| Parcel #: | 43-20-13-206-011 |
| Analysis: | Third lot west of Lombard Street. Purchased by owner of Lombard frontage. However, vacant lot between this lot and owners frontage. No commercial development adjacent. |

## LAND SALE #5

| | |
|---|---|
| Location: | Prairieview Road and Tin Cup Road<br>Mahomet, Illinois |
| Grantor: | Midland Corporation |
| Grantee: | Casey's General Store |
| Size: | 30,624 sq. ft. |
| Zoning: | C-2 - Commercial |
| Sale Date: | December 1997 |
| Sale Price: | $ 110,000.00 or $3.59 per sq. ft. |
| Doc. No.: | 97R02206, Champaign County Recorder's Office. |
| Analysis: | This parcel is located on the southeast corner of Prairieview and Tin Cup, northeast of Mahomet, Illinois.  It is north of the interchange with Interstate 74.  It has been improved with a Casey's General Store. |

## LAND SALE #6

| | |
|---|---|
| Location: | 112 South Lombard Street<br>Mahomet, Illinois |
| Grantor: | Parker |
| Grantee: | Monical Pizza |
| Size: | 1.75 Acres or 76,230 sq. ft. |
| Zoning: | C-2 – Commercial |
| Sale Date: | March 2005 |
| Sale Price: | $ 250,000.00 or $3.28 per sq. ft. |
| Doc. No.: | 2005R06610, Champaign County Recorder's Office |
| Analysis: | Purchased for new pizza restaurant location.  Lot has only 98.2' of frontage.  River forms rear boundary.  Rear portion of the lot in flood plane.  Improvements no value for commercial use. |

**Brown & Brown Real Estate Appraisals**

E-FILED
Monday, 21 August, 2006  11:40:56 AM
Clerk, U.S. District Court, ILCD

**COMPARABLE LAND SALES GRID:**

| Sale | Sale Date | Sft. Size | Price P/Sft. | Time Adj. | Adj. P/Sft. | Usable& Location | Size& Shape | Corner | Total Adj. | Adj. P/Sft. |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 8/04 | 43200 | $5.30 | + 5% | $5.57 | + 5% | -0- | +10% | +15% | $6.40 |
| 2 | 7/00 | 58893 | $4.37 | +24% | $5.42 | +10% | -0- | +10% | +20% | $6.50 |
| 3 | 1/05 | 50000 | $4.00 | + 2% | $4.08 | +40% | -0- | +10% | +50% | $6.12 |
| 4 | 12/02 | 10890 | $2.75 | +12% | $3.08 | +80% | +10% | +10% | +100% | $6.16 |
| 5 | 12/97 | 30624 | $3.59 | +37% | $4.92 | +25% | -0- | -0- | +25% | $6.15 |
| 6 | 3/05 | 76230 | $3.28 | + 1% | $3.31 | +50% | +30% | +10% | +90% | $6.30 |

The subject location, due to proximity to the Interstate and advertising value of location to Interstate Travelers, is quite valuable.  In addition, local traffic to the shopping center east of the subject is a valuable traffic builder to the subject.  Thus,

Subject Land Size 43,571 sq. ft. @ $6.25 per sq. ft. =          $ 274,497.00

Say,          $ 275,000.00

**Adjustments:**

Time Adjustment is based on the cost of living index of 4%± per year in recent years.  In addition, the increase in real estate values of 5% to 6% per year has occurred.

Location Adjustment based on positioning and desirability of the comparable land parcels.

Size Adjustment based on positive or negative effect resulting from the size of each comparable property.

Corner Adjustments are based on increased site advantages of corner locations.

**Brown & Brown Real Estate Appraisals**
118 S. RACE STREET • P.O. BOX 488
URBANA, ILLINOIS 61801

30

## COST APPROACH

The next step of the Cost Approach, after estimating the land value, is to estimate the Replacement Cost New of the facility. Replacement Cost New is the estimated cost to construct, at current prices as of the effective appraisal date, a building with utility equivalent to the building being appraised, using modern materials and current standards, design, and layout.

Costs that relate to the construction of a physical improvement are referred to as "Direct or Hard Costs." Costs relating to the expenditures that are necessary for construction but not normally included in the construction contract are referred to as "Indirect or Soft Costs." Examples of Indirect Costs include title cost, architectural fees, appraisal and legal fees, insurance during the interim period, financing charges during the interim period and sales or marketing commissions. In addition to the Direct and Indirect Costs, Entrepreneurial Profit must be included as a cost. This market driven amount represents the risk and expertise involved with the project.

There are several cost data sources that can be employed to determine the Replacement Cost New of the subject property. Actual historical costs incurred represent the best source. However, actual costs of other similar properties known to your appraiser is considered to be the next best source if the historical costs are not know. Cost publication services may also be employed to determine an estimate of Replacement Cost New. Your appraiser uses the Marshall and Swift Publication Company with costs updated on a monthly basis.

There are several methods for cost estimating which include the Comparative-Unit Method, Unit-in-Place Method and the Quantity Survey Method. The Comparative-Unit Method is regarded as the most straight forward and practical method. This method will be employed in this report with the unit price based on a per square foot method. The cost estimate includes both the hard and soft costs but excludes profit.

## REPRODUCTION COST NEW – ESTIMATE

<u>Building Summary</u>

Provider:    MARSHALL VALUATION SERVICE

Building Type:    Restaurants (350)
                Section 13
                Page 14
                Class – D
                Quality Type – Average
                Last Update of Page – May 2004

Subject Building:    Built – 1975+
                Total Size – 2,136 sq. ft.
                Estimated Remaining Building Life - 50 years
                Estimated Effective Age - 25 years

Value for each of the subject buildings:

| | |
|---|---|
| Base Cost Per Square Foot    - | $ 79.55 per sq. ft. |
| Modification: | |
|     Floor Area/Perimeter Adjustment | x   1.22 |
| Adjusted Cost | $ 97.05 per sq. ft. |
| Regional Multiplier (Central USA) | x   1.09 |
| Adjusted Cost | $105.78 per sq. ft. |
| Local Multiplier (Champaign, Illinois) | x   1.04 |
| Adjusted Cost | $110.01 per sq. ft. |

Thus:

| | | |
|---|---|---|
| 700 E. Eastwood Drive | 2,136 sq. ft. @ $ 110.01 per sq. ft. = | $ 234,981.00 |
| Porches, Stairways, etc. | | $  12,000.00 |
| Total Building Reproduction Cost New Estimate | | $ 246,981.00 |

Less Depreciation:

| | | | |
|---|---|---|---|
| Physical | | | |
| | Curable | $ 30,000.00 | |
| | Incurable | $ 81,504.00 | |
| | | | $111,504.00 |

**Brown & Brown Real Estate Appraisals**
118 S. RACE STREET • P.O. BOX 488
URBANA, ILLINOIS 61801

```
Functional
        Curable        $       0
        Incurable      $ 25,000.00.
                                    $ 25,000.00

External
        Locational     $       0
        Economic       $       0  .
                                    $       0  .
```

| | |
|---|---|
| Depreciation From All Sources | $ 136,504.00 |
| Depreciated Value of Improvements | $ 110,477.00 |
| Asphalt Parking – 25,000 sq. ft. (Depreciated Value) | $ 20,000.00 |
| Yard Lighting (Depreciated Value) | $ 500.00 |
| Land Value | $ 275,000.00 |
| Total | $ 405,977.00 |
| Value by the Cost Approach (Fee Simple)   Say, | $ 405,000.00 |

## DEPRECIATION

Depreciation in appraising is (1) a loss in property value from any cause; the difference between the reproduction or replacement cost of an improvement on the effective date of the appraisal and the market value of the improvement on the same date. (2) With regard to improvements, deterioration encompasses both deterioration and obsolescence. (3) With regard to accounting, an allowance made against the loss in value of an asset for a defined purpose and computed using a specified method.

Definition of these types of depreciation is as follows:

Physical Deterioration – An element of accrued depreciation. For purposes of appraisal analysis, it is most common and convenient to divide physical deterioration into curable and incurable components.

Physical Curable Deterioration:

Physical deterioration which the prudent buyer would anticipate correcting upon purchase of the property. The cost of effecting the correction or cure would be no more than the anticipated addition to utility, and hence ultimately to value, associated with the cure. Curable physical deterioration is frequently termed "deferred maintenance" or rehabilitation, because these terms reflect the type of activity typically associated with correcting the condition.

Physical Incurable Deterioration:

Physical deterioration which in terms of market conditions as of the date of the appraisal is not feasible or economically justified to correct. The cost of correcting the condition or effecting a cure is estimated to be greater than the anticipated increase in utility, and hence ultimately in value, of the property that will result from correcting or curing the condition. For purposes of appraisal analysis, incurable physical deterioration may be divided into short-lived and long-lived elements.

Functional Obsolescence:

Impairment of functional capacity or efficiency. Functional obsolescence reflects the loss in value brought about by such factors as defects, deficiencies, or superadequacies, that affect the property item itself or its relation with other items comprising a larger property. The inability of a structure to perform adequately the function for which it is currently employed. This also can be divided between curable and incurable components.

External Obsolescence:

Impairment of desirability or useful life arising from factors external to the property, such as economic forces or environmental changes, which affect supply-demand relationships in the market.  Loss in the use and value of a property arising from factors of economic obsolescence is to be distinguished from loss in value from physical deterioration and functional obsolescence, both of which are inherent in the property.  This can be divided between locational and economic components.

Physical Deterioration

Items of deferred maintenance noted include general upgrading of the facility.  This includes painting, small repairs needed to continue general maintenance.  This is estimated at $30,000.00 to completely restore the curable maintenance.  All of this is not immediately necessary to continue usage and rental of the subject property.

Incurable physical deterioration was made by the Age/Life method.  The calculations were based on a percentage that is derived by dividing the effective age by the total economic life (25/75 = 33%).

Functional Obsolescence

Though the subject property still operates as a "Hen House" restaurant, designs and layouts of such facilities have changed over the years to adapt to present styles.  It is estimated that the subject has incurable functional obsolescence of some $25,000.00.  There is no curable functional obsolescence noted.

External Obsolescence

There is no external obsolescence noted.  The subject is in a good location surrounded by compatible property.

## INCOME CAPITALIZATION APPROACH

The Income Capitalization Approach is based on the understanding that there is present worth to future rights of income. The approach is multi-step and involves the estimate of Market Rent to determine Potential Gross Operating Income. Operating expenses are deducted from the Potential Gross Operating Income to determine a Net Operating Income, which is capitalized into value. The capitalization rate is market oriented and it takes into consideration the return on and return of the capital expenditure.

The initial step of the Income Capitalization Approach is to determine Market Rent. The comparable data in this area is limited.

## SUBJECT LEASE DATA

The subject is presently under lease. The current rental has been and is $20,200.00 per year since inception which was 1975. In addition, the lease calls for the tenant to pay a 5% additional rental based on the gross sales above $50,000.00 per year. The owner indicates surplus rent over the past number of years to average about $7,000.00. This would be based on a yearly gross income of some $190,000.00 and a surplus rent of $140,000.00. All of this information indicates a current subject rental of some $27,200.00 per year. There has been no rental increase during the past thirty years of the lease. The lessee currently pays 50% of the real estate taxes.

Rental of a similar sized restaurant facility, adjacent to Interstate 74 is indicated to be $4,000.00 per month. This is a triple net rental. The condition, size and amenities, as well as storage space is considerably superior to that of the subject. However, the location is slightly inferior.

Based on the above data and other known restaurant and commercial retail space with similar style, quality and condition, the following economic rental is estimated based on a triple net lease arrangement.

Subject Estimated Economic Rental Income:

| | | | |
|---|---|---|---|
| Subject Property | $3,000.00 per month x 12 months | = | $ 36,000.00 |
| Total Annual Economic Gross Income Potential | | | $ 36,000.00 |

**Brown & Brown Real Estate Appraisals**
118 S. RACE STREET • P.O. BOX 488
URBANA, ILLINOIS 61801

## CONSTRUCTED OPERATING INCOME STATEMENT

| | |
|---|---|
| Gross Annual Operating Income Potential: | $ 36,000.00 |
| Less:  Vacancy, Collection Loss & Management  - 8% | $   2,880.00 |
| Net Operating Annual Income | $ 33,120.00 |

## ANALYSIS OF INCOME AND EXPENSES

Gross Operating Income was calculated by multiplying the Market Rent times the 12 months to gain annual figure.

Vacancy & Collection Losses were estimated at 2% of the Gross Operating Income.  This has been determined to be a justifiable number based on other similar rental properties in the area.

Fixed Expenses

 None Noted due to Triple Net Lease Assumption.

Variable Expenses

 Management was estimated to be 3% of the Effective Gross Income.

Reserves and Replacement was calculated at $.50 per sq. ft. of the Gross Building Area, rounded. 2,136 x $.50 = $1,068.00 or 3% of the Effective Gross Income.

Total Operation Expenses totaled $2,880.00 which is 8% of Effective Gross Income.

Net Operating Income was in the amount of $33,120.00, which represents 92% of Effective Gross Income.

**Brown & Brown Real Estate Appraisals**

## CAPITALIZATION PROCESS AND RATE

Capitalization is the process of converting income to value. The Capitalization Process can be either Direct Capitalization or Yield Capitalization. There are three basic variables in the capitalization process, which are:

| | | |
|---|---|---|
| Vo | = | Property Value |
| Ro | = | Overall Capitalization Rate |
| NOI | = | Net Operating Income |

The relationship of these variables is as follows:

$$\frac{NOI}{Vo} = Ro$$

Direct Capitalization is most effective when the comparable sales are adequate to develop meaningful rates or when other market oriented data can be obtained in order to derive rates through alternative methods. It is important that the rates and multipliers are derived in a manner consistent with the subject's income stream. The use of Direct Capitalization utilizes a single year's income stream and is not relevant in poor market conditions. It is most applicable when income streams are considered to be stable and consistent with no major changes anticipated. Yield Capitalization is a more useful method of capitalization when income streams are variable and/or values at the end of the holding period are anticipated to change.

There are several different types of Direct Capitalization methods which include the Gross Income Multiplier and Net Income Ratio, Band of Investment Technique, Residual Techniques which include land, building and equity as well as the Debt Coverage Ratio Technique. The selection of the method depends upon the data available.

Different types of Yield Capitalization Methods include a Discounted Cash Flow Analysis, as well as Elwood and Income Models that utilize a variety of premises. The selection of which method of Yield Capitalization is also dependent upon data given or available.

**Brown & Brown Real Estate Appraisals**
118 S. RACE STREET • P.O. BOX 488
URBANA, ILLINOIS 61801

38

## CAPITALIZATION METHOD

The subject property has experienced a relatively level income stream. Although moderate rent level increases have been experienced it is considered to be stable and no major changes are anticipated in the property value during the holding period. Therefore, Direct Capitalization is favored with the Mortgage/Equity Band of Investment technique selected. The Band of Investment technique is based on the following relationship:

| Ratio | | Rate | | Weighted Rate |
|-------|---|------|---|---------------|
| M | x | Rm | = | Mortgage Contribution |
| E | x | Re | = | Equity Contribution |
| | | Ro | | Overall Rate |

Definitions:

| M | = | Loan to Value Ratio |
|---|---|---------------------|
| Rm | = | Capitalization Rate to Mortgage or Mortgage Constant |
| Re | = | Capitalization Rate to Equity or Equity Dividend Rate |
| E | = | (1-M) (% of Equity) |

### Mortgage Interest Rate

Mortgage Interest Rates are currently in the 7% to 7.5% range with 20-30 year amortization periods with Loan to Value Ratios ranging between 70% and 80%. Typically loans include a 5-10 year balloon. These terms are typical of those found in the local market. A survey of rates in the local marketplace is done on a continual basis. Furthermore, publications are available in this appraiser's office relating to current mortgage rates on a national basis. Therefore, based upon the property's location and age, as well as prevailing market conditions, typical mortgage terms would be as follows:

| | | |
|---|---|---|
| Ym (Mortgage Interest Rate) | = | 7.25% |
| M (Loan to Value Ratio) | = | 75% |
| Amortization Period | = | 25 years |
| (Balloon) | = | 5 years |
| Rm (Mortgage Constant) | = | .0867368 |

### Equity Dividend Rate

The Equity Dividend Rate, referenced by the symbol, Re, represents a cash on cash rate. Stated differently, it is a free and clear Equity Capitalization Rate. This rate takes into consideration the expectations that investors seek for this type of real estate investment. Factors affecting rate consideration include returns for alternative investments, real estate's non-liquidity, tax implications, ongoing management in addition to the risks for this particular type of real estate investment. National publications are referenced for the range of Equity Cap Rate. An Equity Dividend Rate of 10% is considered to be appropriate for this property based upon rate expectations for a property of this type.

**Capitalization Rate Calculation Using the Band of Investment Technique:**

| Loan & Equity | | | Rm | | |
|---|---|---|---|---|---|
| M | | x | Re | = | Weighted Rate |
| Mortgage | .75 | x | .0867368 | = | .0650526 |
| Equity | .25 | x | .10 | = | .0250000 |
| | | | Ro | = | .0900526 |

**Capitalization Process and Value by the Income Capitalization Approach:**

$$V_o = \frac{NOI}{Ro} = \frac{\$\,33{,}120.00}{.0900526} = \$\ 367{,}785.00$$

| Value by the Income Capitalization Approach | |
|---|---|
| (Fee Simple) | $  368,000.00 |

**VALUE OF PARTIAL INTEREST**

Market Value is the sum of the Present Value of Income plus the Present Worth of the Reversion. Furthermore, relationships of the value of the Leased Fee, of Leasehold and the Market Value of Fee Simple Estate can be shown by the following equations:

$V_o$  =  Value for Fee Simple Estate
$V_{LH}$  =  Value for Leasehold Estate
$V_{LF}$  =  Value for Lease Fee Estate

$$V_o \ = \ V_{LH} + V_{LF}$$

It is recognized that the Value of the Fee Simple Estate is equal to the Value of the Leasehold Estate plus the Value of the Leased Fee Estate. This relationship is important in valuing partial interest, particularly when the terms of the lease are either below or above market. The differential between the Market and the Contract creates value for either the owner or tenant (lessor or lessee). Therefore combining the values of both the lessor and lessee in the form of Leased Fee and Leasehold Estate results in a total value for the property.

The subject property is not presently under lease so there is no Contract Rent to analyze. However, the following discounted cash flow analysis will be utilized to further justify the income value estimate.

| Year | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Gross Operating Income | 36,000. | 37,080. | 38,192. | 39,338. | 40,518. |
| Less: Vacancy, Collection Losses & Management | 2,880. | 2,966. | 3,055. | 3,147. | 3,241. |
| Net Operating Income | 33,120. | 34,114. | 35,137. | 36,191. | 37,277. |
| Present Value @ 10% | .90909 | .82645 | .75132 | .68301 | .62092 |
| Present Value of Income | 30,109. | 28,194. | 26,399. | 24,719. | 23,146. |

Present Value of Income:

| Year | |
|---|---|
| 1 | $  30,109.00 |
| 2 | 28,194.00 |
| 3 | 26,399.00 |
| 4 | 24,719.00 |
| 5 | 23,146.00 |
| Total | $ 132,567.00 |

Present Value of Reversion

Year 5      $\dfrac{23,146.00}{.10}$      =      $ 231,460.00

Total                          $ 364,027.00

Say,  $ 364,000.00

    The two values indicated by this approach are $368,000.00 and $364,000.00.  Based on the data presented equal weight is given to estimate the following value:

Indicated Value by Income Analysis:            $ 366,000.00

**Brown & Brown Real Estate Appraisals**

**SALES COMPARISON APPROACH**

The Sales Comparison Approach or Market Data Approach is based on the principal of substitution. This involves making a comparison of the subject property with other similar properties that have recently sold. This approach to value is based on the premise that the buyer would not pay more for a property that it would cost to acquire a comparable substitute property. In addition, to differences in physical factors that influence value levels, adjustments must be made for changes in market conditions since the date of the transaction, the status of leasing and occupancy at the time of sale, upside income potential, protection from increases in operating expenses, differences in financing the motives of the buyers and the sellers and a variety of other factors that have an impact on the price at which a property sells. This approach is most effective in an active market place.

Sales of properties that contain the same salient features as the subject property have been collected. The comparable sales have been analyzed and market extracted adjustments can be made for those significant differences that exist between the subject and the comparable. The sales are adjusted for property rights conveyed, conditions in the market, terms of financing, unusual conditions of sale, physical characteristics and location. The adjusted price represents what the property would have sold for if it contained the same characteristics as the subject.

The data shown on the following pages represent the most comparable sales available in this market.

## IMPROVED PROPERTY SALE #1

| | |
|---|---|
| Location: | 501 East Main Street<br>Mahomet, Illinois |
| Grantor: | McDonald |
| Grantee: | McCool |
| Date of Sale: | August 2000 |
| Sale Price: | $ 240,000.00 |
| Parcel #: | 15-13-15-182-001 |
| Lot Size: | 66' x 125' = 8,250 sq. ft. |
| Description: | One story southern pine log construction.  Built in 1992.  Retail gift shop facility in good condition.  Total building area of 3,000 sq. ft.  Open front porch, no basement.  Adequate on-site parking. |
| Analysis: | Land value estimated at $37,500.00 and improvement value at $202,500.00.  Sale represents $67.50 per sq. ft. of building only. |

**IMPROVED PROPERTY SALE #2**

| | |
|---|---|
| Location: | 1103 East Oak<br>Mahomet, Illinois |
| Grantor: | Napier |
| Grantee: | Scott |
| Date of Sale: | November 2003 |
| Sale Price: | $ 325,000.00 |
| Parcel #: | 15-13-15-477-002 |
| Doc. No.: | 2003R57686, Champaign County Recorder's Office. |
| Lot Size: | Irreg. Shape – 457' frontage, 129' deep = 58,953 sq. ft. |
| Description: | Used car dealership located just east of downtown. Metal building containing 6,200 sq. ft. Showroom, office and garage use. Surfaced on-site asphalt parking. Average to good improvement condition. |
| Analysis: | Land Value estimated at $90,000.00, improvement value at $235,000.00. Sale represents $37.90 per sq. ft. of building only. |

**Brown & Brown Real Estate Appraisals**

**IMPROVED PROPERTY SALE #3**

Location:               11 North Chestnut
                        Pesotum, Illinois

Grantee:                R. Ruggieri

Date of Sale:           April 2002

Sale Price:             $ 275,000.00

Parcel #:               18-32-23-303-006 & 007

Lot Size:               70' x 100'$\pm$ or 7,000$\pm$ sq. ft.

Description:            One story masonry and frame commercial building.  Subject designed for
                        restaurant and tavern operation.  Building consists of 6,270 sq. ft. of area
                        and in average to good condition for its age.

Analysis:               Land valued at $15,000.00, improvement value at $260,000.00.  Sale
                        represents $41.47 per sq. ft. of the first floor building area only.

**Brown & Brown Real Estate Appraisals**
118 S. RACE STREET • P.O. BOX 488
URBANA, ILLINOIS 61801

45

**IMPROVED PROPERTY SALE #4**

| | |
|---|---|
| Location: | 404 West University Avenue<br>Urbana, Illinois |
| Grantor: | Kiser-Burch |
| Grantee: | Modi Family Corp. |
| Date of Sale: | July 2003 |
| Sale Price: | $ 500,000.00 |
| Lot Size: | 132' x  264' = 34,848 sq. ft. |
| Parcel #: | 91-21-08-328-013 |
| Doc. No.: | 2003R30896, Champaign County Recorder's Office |
| Description: | formerly a Hardee's Fast Food Restaurant.  Building constructed for drive-up, take out and interior sit down food service.  Building consists of 4,000+ sq. ft. with drive up window.  Average condition.  The remainder of the land area is concrete drive and parking. |
| Analysis: | Land value estimated at $350,000.00, and improvement value at $150,000.00.  Sale represents $37.50 per sq. ft. of building only. |

**Brown & Brown Real Estate Appraisals**

118 S. RACE STREET • P.O. BOX 488

URBANA, ILLINOIS 61801

46

**IMPROVED PROPERTY SALE #5**

| | |
|---|---|
| Location: | 903 West Marketview Drive |
| | Champaign, Illinois |
| Grantor: | Hardee's Food System's Inc. |
| Grantee: | T/KAT, Inc. |
| Date of Sale: | January 2002 |
| Sale Price: | $ 450,000.00 |
| Parcel #: | 41-20-02-276-009 |
| Lot Size: | Irregular – 32,496 sq. ft. |
| Doc. No.: | 2002R04339, Champaign County Recorder's Office. |

Description:   Built in 1992 as a Hardee's Fast Food Restaurant facility.  Building consists of 4,262 sq. ft. or area with a covered drive-up.  Average condition, awkward corner location.  20,000 sq. ft. of parking and drive area.

Analysis:   Land value estimated at $225,000.00, improvement value at $225,000.00. Sale represents $52.79 per sq. ft of building only.

**IMPROVED PROPERTY SALE #6**

Location:             21 Kenyon Road
                      Champaign, Illinois

Grantor:              First Busey Trust #2231

Grantee:              Alit Selimi & Isen Balazi

Date of Sale:         May 2002

Sale Price:           $ 400,000.00

Parcel #:             41-20-01-428-016

Lot Size:             Irregular – 1.29 Acres

Doc. No.:             2002R16520, Champaign County Recorder's Office.

Description:          Built in 1980 as a Denny's Franchise Restaurant facility. Converted to
                      similar usage. Building consists of 5,008 sq. ft. of interior area in average
                      condition. 31,000 sq. ft. of parking and drive area.

Analysis:             Land value estimated at $150,000.00, improvement value at $250,000.00.
                      Sale represents $49.92 per sq. ft of building only.

**Brown & Brown Real Estate Appraisals**
118 S. RACE STREET • P.O. BOX 488
URBANA, ILLINOIS 61801

48

**IMPROVED PROPERTY SALE #7**

Location:           1902 Center Drive
                    Champaign, Illinois

Grantor:            Denny's, Inc.

Grantee:            Vicorp Restaurants, Inc.

Date of Sale:       September 2002

Sale Price:         $ 675,000.00 Building
                    $   20,000.00 Personal Property

Parcel #:           41-20-01-201-001

Lot Size:           Irregular – 1.07 Acres or 46,610± sq. ft.

Doc. No.:           2002R28999, Champaign County Recorder's Office.

Description:        One story masonry building designed for use as a sit down restaurant.
                    Building built in 1980 and consists of 5,457 sq. ft.  Located near Market
                    Place Mall.  Structure in average condition.  Parking area of 33,000± sq.
                    ft.

Analysis:           Land value estimated at $450,000.00, improvement value at $225,000.00.
                    Sale represents $41.23 per sq. ft of building only.

**Brown & Brown Real Estate Appraisals**

**IMPROVED PROPERTY SALE #8**

Location:            2006 West Springfield Avenue
                     Champaign, Illinois

Grantor:             Schmidt

Grantee:             Johnson

Date of Sale:        March 2005

Sale Price:          $ 750,000.00

Parcel #:            41-20-10-452-005

Lot Size:            25,800 sq. ft.

Description:         One story sit down restaurant located in west Champaign, Illinois.  Brick
                     and frame structure containing 3,954 sq. ft. of area.  Property in good
                     condition.  20,000 on-site asphalt parking area.

Analysis:            Land value estimated at $350,000.00, improvement value at $400,000.00.
                     Sale represents $101.20 per sq. ft of building only.

**Brown & Brown Real Estate Appraisals**
118 S. RACE STREET • P.O. BOX 488
URBANA, ILLINOIS 61801

50

**SUMMARY OF IMPROVED PROPERTY SALES**

**SALE COMPARISON PER SQ. FT.:**

| Sale | Sale Date | Sft. Size | Price P/Sft. | Time Adj. | Adj. P/Sft. | Size-Age-Condition | Adj. P/Sft. |
|------|-----------|-----------|--------------|-----------|-------------|---------------------|-------------|
| 1 | 8/00 | 3000 | $67.50 | +19% | $80.33 | -50% | $40.17 |
| 2 | 11/03 | 6200 | $37.90 | + 6% | $40.17 | -10% | $36.15 |
| 3 | 4/02 | 6270 | $41.47 | +13% | $46.86 | -20% | $37.49 |
| 4 | 6/03 | 4000 | $37.50 | +12% | $42.00 | -10% | $37.80 |
| 5 | 1/02 | 4262 | $52.79 | +14% | $60.18 | -30% | $42.13 |
| 6 | 5/02 | 5008 | $49.92 | +13% | $56.41 | -25% | $42.31 |
| 7 | 9/02 | 5457 | $41.23 | +11% | $45.77 | -20% | $36.62 |
| 8 | 3/05 | 3954 | $101.20 | -0- | $101.20 | -60% | $40.48 |

The above sales result in a range of sale prices per square foot varying between $37.50 and $101.20 prior to adjustments. After adjustments the range narrows from $36.15 per sq. ft. to $42.31 per sq. ft. Adjustments include date of sale, which was made initially based on 4% per year. With other adjustments, namely age, size, condition made on a cumulative basis. All of the sales have good similarity to the subject. Sale #1 and #8 have the largest adjustments. The average adjusted sales data indicates a value of $39.14 per sq. ft., while the mean is $38.99 per sq. ft. Therefore, with emphasis given to these sales, a unit value of $39.00 per square foot is established for the subject building improvement value.

Thus,

| | | | |
|---|---|---|---|
| 2,136 sq. ft. @ $39.00 per sq. ft. | = | $ 83,304.00 |
| Adding Bare Land Value Estimate | | $ 275,000.00 |
| | Say, | $ 358,304.00 |
| Estimated Value by Sales Comparison Approach | | $ 358,000.00 |

**Brown & Brown Real Estate Appraisals**

## RECONCILIATION AND VALUATION

Cost Approach                                      $ 405,000.00

Income Capitalization Approach                     $ 366,000.00

Sales Comparison Approach                          $ 358,000.00


The correlation process is applied throughout the appraisal in each of the three approaches. This is accomplished by analyzing the data used in each approach. The final Reconciliation is the process of evaluating the estimates of value indicated by each of the three approaches. Therefore, at this time this appraiser weighs the relative significance, applicability, and defensibility of each approach and places weight on the approach that best approximates the value being sought in the appraisal. Theoretically, the three approaches should arrive at the same value estimate. However, due to the imperfection in the marketplace, this rarely occurs.

The Cost Approach is considered to be the least reliable of the three approaches due to the subjectivity involved in depreciation. Depreciation is limited to physical and was calculated by the Age Life Method. However, due to the subjectivity involved in this approach, the reliability of the approach is diminished.

The Income Capitalization Approach is generally considered to be the most applicable of the three approaches for income producing properties since is most closely emulates the actions of typical investors in the marketplace. The subject property is not presently leased. Therefore, the gross operating income was estimated, as well as expenses, which then calculated the net operating income capitalized by an Overall Rate which was derived by the Mortgage Equity Technique. A discounted cash flow was presented for this analysis. The Income Approach is considered to be the most reliable of the three approaches.

The Sale Comparison Approach is also considered to be a reliable approach for this appraisal. The strength of this approach is that it is the most straight forward of the three approaches and there were a number of comparable sales available to analyze. However, there is subjectivity involved in estimating during the adjustment process. Nevertheless, this approach is considered to be reasonably reliable for determining the Market Value of the property (Fee Simple).

Therefore, in valuing the subject, the Income Approach is considered the most reliable and has been given the primarily emphasis, with secondary emphasis placed on the Sale Comparison Approach. Although the Cost Approach is generally applicable for this property type, it is not considered to be the most reliable approach to value for the subject. Based on the foregoing, the market value of the subject has been concluded as follows.

**Brown & Brown Real Estate Appraisals**
118 S. RACE STREET • P.O. BOX 488
URBANA, ILLINOIS 61801

By reason of my investigation and by virtue of my experience and knowledge of the subject marketplace, I am of the opinion that the subject property has a market value of the fee simple interest, as of May 27, 2005, was:

**THREE HUNDRED SIXTY-FIVE THOUSAND DOLLARS**
**( $ 365,000.00 )**

If you have any questions regarding the value determined or analyses presented or require any additional information please contact the undersigned. I appreciate the opportunity to be of service to you in this matter.

Respectfully submitted,

**BROWN & BROWN REAL ESTATE APPRAISALS**

J. Lloyd Brown
IL Certified General Real Estate Appraiser
License # 153.0000442
Expiration Date: 09/30/2005

## CERTIFICATION OF VALUE

The undersigned do hereby certify that, except as otherwise noted in this appraisal report:

1) The statements of fact contained in this report are true and correct.

2) The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial and unbiased professional analyses, opinions, and conclusions.

3) I have no present or prospective interest in the property that is the subject of this report, and we have no personal interest or bias with respect to the parties involved.

4) I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5) My engagement in this assignment was not contingent upon developing or reporting predetermined results.

6) My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the valued opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7) My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

8) Thomas L. Brown, Certified General Lic. #153.0000139, exp. 9/30/05 has made a personal inspection of the property that is the subject of this report.

9) No one provided significant professional assistance to the person(s) signing this report.

10) I will not reveal the findings and results of this appraisal to anyone other that the proper officials of the client until authorized by said officials to do so or until required to do so by due process of the law.

11) That my opinion of the market value is based upon my independent appraisal and the exercise of our professional judgment without collaboration or direction as to said value.

12) This appraisal report sets forth the limiting conditions imposed by the terms of the assignment or by the undersigned affecting the analysis, opinions, and conclusions contained in this report.

13) I certify that, to the best of our knowledge and belief, the reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Uniform Standards of Professional Appraisal Practice (USPAP).

14) The appraisal report was not based on a requested minimum valuation, a specific valuation, or the approval of a loan.

Date: June 6, 2005          Appraiser: *J. Lloyd Brown*

J. Lloyd Brown
Illinois Certified General Real Estate Appraiser
#153.0000442

**Brown & Brown Real Estate Appraisals**
118 S. RACE STREET • P.O. BOX 488
URBANA, ILLINOIS 61801

54

**QUALIFICATIONS**

J. LLOYD BROWN, APPRAISER
Brown & Brown Real Estate Appraisals
A division of BH&M, Inc.
118 South Race Street, P.O. Box 488
Urbana, Illinois  61803-0488
(217) 367-4011
(217) 384-4346 – Fax


Educational

      Bachelor of Science – Degree from College of Commerce with Major in Business
           Management, University of Illinois, Urbana, Illinois in 1947.

      Completed Course Work and Continuing Education:
- Real Estate Appraisal I – AIREA
- Real Estate Appraisal II  – AIREA
- Small Income Properties – NAIFA
- Financial Analysis of Income Properties – NAIFA
- Standards and Professional Practice – NAIFA
- Attended a variety of Additional Seminars and Courses regarding various aspects of real estate appraising over the past 50 years.


Professional

      Illinois Office of Banks and Real Estate – Certified General Real Estate Appraiser
           – License #153.0000442


Employment History

      Associated with the same organization, and it's predecessors, since 1947.


**Brown & Brown Real Estate Appraisals**
118 S. RACE STREET • P.O. BOX 488
URBANA, ILLINOIS 61801

Representative Clientel
—————————————————

     Various Employee Transfer Companies
     BankChampaign, Champaign, Illinois
     BankIllinois, Champaign, Illinois
     Bank of Rantoul, Rantoul, Illinois
     Bank One, Champaign, Illinois
     Busey Bank, Central Illinois Locations
     Central Illinois Bank, Champaign, Illinois
     Champaign County, Champaign, Illinois
     Champaign County Community Development Corp., Champaign, Illinois
     Champaign Park District, Champaign, Illinois
     Champaign School District #4, Champaign, Illinois
     City of Champaign, Champaign, Illinois
     City of Charleston, Charleston, Illinois
     City of Danville, Danville, Illinois
     City of Rantoul, Rantoul, Illinois
     City of Urbana, Urbana, Illinois
     Eastern Illinois University
     First Federal Savings Bank, Champaign, Illinois
     Illinois Power Company
     Internal Revenue Service
     Mattoon Federal Savings & Loan, Mattoon, Illinois
     Norfolk and Western Railroad
     State of Illinois, Division of Highways
     University of Illinois, Urbana, Illinois
     Urbana School District #116, Urbana, Illinois
     Veterans Administration

     In addition, have appraised for various Attorneys and Individuals for estates and other value requests.

**Brown & Brown Real Estate Appraisals**